1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LUZ HERNANDEZ,                                    No. C-09-02782 EDL

       Plaintiff,                         **ORDER GRANTING IN PART AND
                                                  DENYING IN PART COUNTY OF NAPA
 v.                                               DEPUTY SHERIFF JOHN HALLMAN'S
                                                  MOTION FOR SUMMARY JUDGMENT
CITY OF NAPA, et al.,                             OR SUMMARY ADJUDICATION**

       Defendants.

_____/

     This action arises out of Plaintiff Luz Hernandez's arrest on April 1, 2008 following police

officers from the City of Napa and the Napa County Sheriff's Department's response to a report of

domestic violence in her home.  Before the Court is Defendant Napa County Deputy Sheriff John

Hallman's Motion for Summary Judgment or Summary Adjudication of Plaintiff's § 1983 claim

against him.  Deputy Hallman's Motion is GRANTED IN PART and DENIED IN PART.

**I.    Factual Background**

     The City of Napa Police Department and the Napa County Sheriff's Department are separate

legal entities, but they share the same radio channel most of the time and therefore Napa County

Sheriff's Department members can hear radio communications dispatched within the City of Napa.

Gilbert Decl. Ex. I (Hallman Depo.) at 48-49.  Napa County officers can and do respond to calls

within the City of Napa.  Id. at 67.

**United States District Court**
For the Northern District of California

1    On April 1, 2008, Plaintiff Luz Hernandez and her ex-boyfriend Defendant Donald Green, who

2    is a Napa State Hospital security officer, were involved in an altercation in her home.  Second

3    Amended Complaint ("SAC") ¶ 10.  On that day, Plaintiff left work before 10:00 p.m. so that she

4    would have time to get home before Mr. Green's shift ended at 10:00 p.m.  SAC ¶ 11.  When she

5    arrived home, Ms. Hernandez found Officer Green in her house wearing only his underwear.  Gilbert

6    Decl. Ex. H (Hernandez Depo.) 88.  He was intoxicated and stumbling and "had to bounce himself

7    off from wall to wall."  Hernandez Depo. 89-90.  He was bleeding from what looked like a mole he

8    had tried to cut with a pair of scissors.  Hernandez Depo. 153.  Mr. Green stumbled towards

9    Plaintiff, tried to hug her and stated that he wanted to talk to her.  SAC ¶ 13.  Plaintiff ran to the

10   front door, but Mr. Green grabbed her from behind with both of his hands.  SAC ¶ 13.  Plaintiff tried

11   to get away, and told Mr. Green that she wanted him to leave.  SAC ¶ 13.  Plaintiff telephoned 911

12   while yelling "get the f*#% out of my house," during which Mr. Green slapped the telephone from

13   her hands.  SAC ¶ 13; Pori Decl. Ex. B (Bender Depo.) 47-48.  She started yelling for help.  SAC ¶

14   13.

15   As a result of Plaintiff's 911 call, the dispatcher assigned City of Napa Officer Bender and two

16   other City of Napa officers to Plaintiff's residence.  Deputy Sheriff John Hallman of the Napa

17   County Sheriff's Department heard the call, determined that he was closer to Officer Bender than the

18   other two officers, and volunteered to respond to provide "cover" to Officer Bender until the two

19   other officers could get there.  Gilbert Decl. Ex. I (Hallman Depo.) at 62, 65, 69-70.  When Deputy

20   Hallman arrived on scene, he could not "remember exactly what the call was, but [that] it was

21   something – either 911 hang-up or 415 family disturbance, something to that effect."  Hallman

22   Depo. at 88.  As Deputy Bender approached the house, he heard yelling inside.  SAC ¶ 15.  When he

23   first arrived, Deputy Hallman did not inquire as to who called the police because it did not matter to

24   him who made the call.  Hallman Depo. 89. Upon arrival at Plaintiff's residence, Deputy Hallman

25   activated a digital recording device worn on his person to record the incident.  Hallman Depo 57, 90.

26   Deputy Hallman did not book the recording into evidence or provide it to Officer Bender and did not

27   write a report regarding the incident.  Hallman Depo. 58, 63-65, 91.  However, the recording was

28   maintained and has been produced in this litigation, and both sides rely heavily on it in connection

with this motion.[1]

Upon entering Plaintiff's residence, Deputy Hallman and Officer Bender separated Plaintiff and Mr. Green, and Deputy Hallman escorted Plaintiff to her bedroom.  SAC ¶ 15, Hallman Depo. 72-73; Hernandez Depo. 134.  Deputy Hallman's contact with Plaintiff in her bedroom lasted two to three minutes.  Hernandez Depo. 316, 319.  Deputy Hallman asked Plaintiff what happened and whether she was okay, she responded that she was "fine."  When Deputy Hallman asked Ms. Hernandez, "What are you fighting about?" Ms. Hernandez replied: "He came into my bedroom." TX 3-4.  Rather than following up on this response, Deputy Hallman introduced himself and asked Ms. Hernandez her name.  TX 4.  Deputy Hallman gathered basic information such as Plaintiff's name and date of birth.  Hallman Depo. 73-74; Hernandez Depo. 113-116, 315-316.  Plaintiff told Deputy Hallman that "nothing happened" and she was not injured.  Hernandez Depo. 116.  He saw her spit what he thought was something pink into the sink, and asked her if her mouth was injured and she said her mouth was just dry.  Hallman Depo. 83, 85-86; Hernandez Depo. 16.  He also asked to see her hands and wrists because he thought he observed a red mark on one wrist and was investigating whether or not Ms. Hernandez had any injuries.  Hallman Depo. 83.

Deputy Hallman did not do a complete investigation but when another City of Napa officer arrived he passed on all of the information he had gathered, including information about red marks on her wrists and spitting red into the sink, so that the primary officer would have as much information as necessary to make the determination as to whether or not there was probable cause to arrest.  Hallman Depo. 36, 74-75, 88, 92; Bender Depo. 66.   This exchange of information was made in front of Plaintiff and she could overhear it.  Hernandez Depo. 323-24.  After Deputy Hallman was relieved by the City of Napa officer, he exited Plaintiff's room and went to the front room of Plaintiff's house.  Hallman Depo. 68, 92.  He had no further involvement or discussion with Plaintiff after that time and he was not in the room when she was arrested.  Hallman Depo. 89; Hernandez Depo. 328, 330-31; Gilbert Decl. Ex. F (Plaintiff's Responses to RFAs) at No. 10.

---

[1]The recording is somewhat inaudible and Plaintiff retained an expert to enhance, clarify and transcribe the recording.  See Gilbert Decl. Ex. A (CD and transcript of recording).  Both parties rely on the transcript of the recording, hereinafter referred to as "TX."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Officer Bender and the other officers proceeded with their investigation of the incident.  When

2    questioned, Plaintiff repeated that "nothing happened" and she was not injured.  Hernandez Depo.

3    116 (officer asked if she had injuries and she said no), 209 (officers kept asking her what happened

4    and she said "nothing"); but see Hernandez Depo. at 131-132 (she told Officer Bender with Deputy

5    Hallman present that Mr. Green attacked her), 135 (told Officer Bender that Mr. Green attacked her,

6    but did not say he "physically attacked" her), 137 (told Officer Bender that Mr. Green attacked her),

7    139-142 (same), 217,  312 (told Officer Bender that Mr. Green attacked her with Deputy Hallman in

8    the room); see also Hernandez Depo. at 132-33 (Deputy Hallman was whistling loudly when she

9    was telling Officer Bender that she was attacked).[2]  Officer Bender asked Plaintiff if she had been hit

10   in the mouth and examined her mouth, but she said nothing.  Bender Depo. 66.

11       During the incident, Plaintiff prepared a written statement confirming that there was a "verbal

12   altercation," but not referencing any attack on her.  Gilbert Decl. Ex. B.  Two days later, she

13   provided a statement to the police stating that, "I am sorry I did not let you know that Donald

14   restrained and hurt me. I did not want him to be in trouble."  Hernandez Depo. 180; Gilbert Decl.

15   Ex. E.   On April 8, 2008, Plaintiff stated under oath that during the investigation, she "was scared,

16   wanted no more problems but wanted Donald to leave [her] house" so she "chose not to say too

17   much" and "did not describe the physical altercation."  See Gilbert Supplemental Decl. Ex. A

18   (written statement attached to "Request for Order").  Plaintiff further confirmed under oath that she

19   did not tell officers that Mr. Green physically attacked her during a May 1, 2008  hearing to obtain a

20   restraining order against Mr. Green.  See id. Ex. B (reporter's transcript of proceedings in Napa

21   County Superior Court) at 26 (testified in court that officers kept asking her what happened and she

22   said "nothing").

23       On the night of the incident, Mr. Green initially stated that, "It didn't get physical" and "hasn't

24   _____

25       [2] Deputy Hallman's recording does not capture any statement by Plaintiff that Mr. Green

26   attacked her.  However, she claims that Deputy Hallman was whistling into the recording while she was
     making this statement, and the transcript states that "whistling is covering up what LH is saying.  She
27   can be heard in the background, but her speech is unintelligible due to the whistling."  TX 17.  It is
     unclear whether Plaintiff and Deputy Hallman knew what each other were saying while in separate
28   rooms.  See  Hernandez Depo. at 328 (while she was in other room, she could hear that there was
     discussion between officers and Mr. Green, but didn't specifically know what they were saying and
     wasn't paying attention).

**United States District Court**
For the Northern District of California

gotten violent." TX 6.  Officer Hallman responded, "No, it got physical. She's – she's got marks on her too."  Id.  Officer Bender never asked Mr. Green if he hit Ms. Hernandez in the mouth, and did not obtain an explanation as to why Ms. Hernandez had blood in her mouth.  Bender Depo. 66, 92. During the incident, Ms. Hernandez asked Officer Bender if Mr. Green was accusing her of hitting him and he denied that Officer Green said Ms. Hernandez hit him.  Bender Depo. 106; Hernandez Depo. 16-18.  The fact that Ms. Hernandez asked Officer Bender if Mr. Green had accusing her of hitting him had no significance in Officer Bender's mind and played no role in his decision to arrest Ms. Hernandez.  Bender Depo. 109.  That night, Mr. Green prepared a written statement stating that Plaintiff pushed and attacked him.  Gilbert Decl. Ex. C; see also Hernandez Depo. at 153 (she remembers punching him).  Based on the information collected, the City of Napa officers arrested Plaintiff for domestic violence.  Gilbert Decl. Ex. D.  Deputy Hallman was not present at the time Plaintiff was handcuffed or arrested.  Hernandez Depo. 331; Plaintiff's Response to RFA No. 10.

While Deputy Hallman was standing in the front of the house after being relieved by the City of Napa officer who took over speaking to Plaintiff, he communicated with Mr. Green and other officers.  Deputy Hallman repeatedly referred to Mr. Green as "brother."  TX p. 4:2-13; 8:21;8:24, 9:6; 13:25; 13:27; 18:20.  During their conversation, Deputy Hallman counseled Mr. Green that he should "think about your whole career cuz this could be – this could change your career and end it." TX 9:1-2.  Deputy Hallman later joked, "I'm going to have you get some clothes, and you need to get the hell out of here."  Hallman Depo. 144.  Deputy Hallman was told that Mr. Green did not have any other clothes but his uniform at Ms. Hernandez's house.  Hallman Depo. 143.  Deputy Hallman asked Mr. Green if they decorated the house, apparently in reference to the disorder of some sheets or pillows in a portion of the house, but according to Deputy Hallman the question was not investigative in nature.  Hallman Depo. 150.

Thereafter, the recording captured portions of Officer Bender discussing taking Ms. Hernandez' photograph, while Deputy Hallman was whistling into the recording.  Hallman Depo. 151-52.  During his deposition, Deputy Hallman acknowledged that he could heard himself creating some sort of music or noise, and explained that the recording "is what it is."  Hallman Depo. 158. Deputy Hallman again made noises into the recording, and then Ms. Hernandez asked, "Is he saying

I hit him?," and then a male voice began speaking and trailed off.  TX 17; Hallman Depo. 160-161.
Deputy Hallman said something like "anytime you have to stop and say, 'I'm not going to go into
that,' that many times again is a clue."  Hallman Depo. 161-162.  Deputy Hallman believed that
since Mr. Green said that he did not want to discuss certain issues, this indicated that there was
likely something important and worth discussing that Mr. Green was guarding.  Hallman Depo. 162,
164, 165.  Deputy Hallman did not believe Mr. Green was being forthcoming about what happened
in the incident.  Hallman Depo. 169.  There is no evidence that Deputy Hallman relayed this opinion
to Officer Bender.

During his deposition, Deputy Hallman listened to the recording and identified a conversation
between Officer Bender and Mr. Green where Officer Bender asked Mr. Green, "do you want to tell
the truth?," and Deputy Hallman testified that this would bring Officer Green's truthfulness into
question.  Hallman Depo. 174.  Officer Green's initial unwillingness to provide a written statement
would lead Deputy Hallman to believe that Mr. Green was withholding information.  Further, if
Officer Green provided Officer Bender a statement that differed from his previous oral statement,
this would also raise credibility questions in Deputy Hallman's mind.  Hallman Depo. 174-77.
Deputy Hallman identified four instances where Officer Green's truthfulness was put into question,
and he did not intervene in the investigation or Plaintiff's arrest and say that further investigation
was necessary.  Hallman Depo 180.  Although Deputy Hallman heard Mr. Green say "I apologize to
you guys.  It was my own fault," Hallman had no concern that the wrong person was being arrested
because the relationship was volatile in nature.  Hallman Depo 191-192.  Deputy Hallman could not
determine whether or not Mr. Green was the dominant aggressor based upon his statements, that he
was perhaps too intoxicated to drive, that he had no other clothing or personal effects in the house at
the time of the incident, or because he was in Plaintiff's house.  Hallman Depo. 170.  Deputy
Hallman did not check to see if there had been previous calls related to violence at the residence, and
he did not know if any other officers made this inquiry.  Hallman Depo. 193.

Once the decision to arrest Plaintiff was made, Officer Bender asked Deputy Hallman to give
Mr. Green a ride to a friend's house.  Bender Depo. 160-161.  Deputy Hallman testified that it is
customary to separate those involved in altercations while one is being taken out in handcuffs to

6

**United States District Court**
For the Northern District of California

1   avoid additional flare-ups, and he agreed to remove Mr. Green from the residence to avoid crossing

2   paths with Ms. Hernandez.  Hallman Depo. 191. Officer Bender identified his voice as the person

3   who spoke the word "teamwork" in the recording when Deputy Hallman was preparing to give Mr.

4   Green a ride, but stated that Mr. Green was not on the "team."  Bender Depo 162.  When Officer

5   Bender spoke the word "teamwork," Deputy Hallman then responded to Bender, "you got kids?"

6   and began singing, "What's gonna work?" TX 29.  Because Deputy Hallman believed Mr. Green

7   was intoxicated, he agreed to give him a ride.  Hallman Depo. 104-105, 109, 110-11.  Ultimately,

8   Deputy Hallman offered to drive Mr. Green outside of the Napa County line, while on overtime.

9   Hallman Depo. 194-195; see also TX 27-28.  Deputy Hallman equated his giving Mr. Green a ride to

10  receiving a taxi ride, and joked that he would charge Mr. Green $50.00.  Hallman Depo. 195-196.

11  Deputy Hallman asked Mr. Green if he was being sneaky for having parked his car around the

12  corner and Mr. Green responded, "kind of."  Hallman Depo196: 10-18.  After observing the car and

13  hearing this response, Deputy Hallman did not think the wrong person had been arrested, and did not

14  notify Officer Bender that the wrong person had been arrested.  Hallman Depo. 196; TX 31.

15       Deputy Hallman believes it is a crime to intentionally arrest someone who should not be

16  arrested, and he would neither personally commit or aid and abet in the commission of an unlawful

17  arrest of a citizen.  Hallman Depo. 203-204.  Deputy Hallman also believes that speaking calmly and

18  cordially to people and building rapport promotes officer safety and honesty.  Hallman Depo. at 132-

19  33.  Deputy Hallman did not relate much of his conversation with Mr. Green to Officer Bender

20  because he thought it was chit-chat and not part of the investigation: "I did not tell Bender, or

21  Officer Bender everything that went on between – with me chitchatting because I chatted about kids,

22  I think a contract at Napa State Hospital that was going to take place, different beers. I chatted with

23  him about telling him Hey, you need to tell the truth, you're held to a standard kind of stuff. So no, I

24  didn't get into all our chitchat with Officer Bender."  Hallman Depo. 71.  However, Deputy Hallman

25  told someone that Mr. Green looked like Ms. Hernandez did a "wildcat on" him, by which he meant

26  that Mr. Green "looked like he picked up a feral cat," but he did not ask Mr. Green how he was

27  scratched because he did not interview him.  Hallman Depo.130-131.

28  **II.   LEGAL STANDARD**

7

1    Summary judgment shall be granted if "the pleadings, discovery and  disclosure materials on

2   file, and any affidavits show that there is no genuine issue as to any material fact and that the

3   movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts

4   are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby,

5   Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient

6   evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view

7   the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable

8   inferences to be drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

9   U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter,

10  but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047,

11  1054 (9th Cir. 1999).  The evidence presented by the parties must be admissible. Fed. R. Civ. Proc.

12  56(e).

13    A party seeking summary judgment bears the initial burden of informing the court of the basis

14  for its motion, and of identifying those portions of the pleadings and discovery responses that

15  demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

16  323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

17  demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

18  where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

19  merely by pointing out to the district court that there is an absence of evidence to support the

20  nonmoving party's case.  Id.

21    If the moving party meets its initial burden, the opposing party "may not rely merely on

22  allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine

23  issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  "Conclusory, speculative

24  testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat

25  summary judgment."  Soremekun v. Thrifty Payless, Inc. 509 F.3d 978, 984 (9th Cir. 2007); see also

26  Nelson v. Pima Community College, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and

27  speculation do not create a factual dispute for purposes of summary judgment").  If the nonmoving

28  party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as

United States District Court
For the Northern District of California

8

1    a matter of law."  <u>Celotex</u>, 477 U.S. at 323.

2    **II.   PLAINTIFF'S EXPERT DECLARATION**

3         Ms. Hernandez's Opposition attaches the declaration of her proposed Police Practices Expert,

4    Roger Clark, who reviewed evidence in this case and concluded in part:

>    This incident is an apparent case of egregious police conduct contrary to training, policy and law by law enforcement officers who knew better. The record demonstrates that Ms. Hernandez was falsely arrested by NPD Officer Garth Bender and NSD Deputy John Hallman after she called 911 for help. Officer Bender and Deputy Hallman ignored the compelling and obvious exculpatory evidence regarding Ms. Hernandez, and the obvious inculpatory evidence that Officer Green was a criminal suspect. Pursuant to their POST training, Officer Bender and Deputy Hallman would be expected and required to know that Ms. Hernandez, at a minimum, was the victim of domestic violence at the hands of Officer Green. Other likely crimes include Burglary (459 PC) and Trespass (602 PC). Rather than arrest Officer Green, they arrested Ms. Hernandez. The obvious motivation for their acts was to protect Officer Green – a brother law enforcement officer who was at risk of discharge if accused of a crime. The Defendant Officers appear in the record as all having a direct involvement in this incident and having deliberately acted contrary to the legal and ethical professional requirements in this set of facts. Their actions included Ms. Hernandez' false arrest and booking which caused financial burdens, and emotional humiliation and mental anguish she endured because their acts. Ms. Hernandez' arrest would not have occurred had the officers followed the ethical and proper basic investigative, arrest, and report writing procedures that are taught to all POST certified officers.

16   Clark Decl. at 5.

17        Deputy Hallman challenges the relevance and admissibility of this declaration by arguing that

18   it contains legal conclusions unsupported by admissible evidence, but did not file a formal objection

19   to evidence.   The declaration is 38 pages long, contains a summary of the materials relied on in

20   reaching the conclusions drawn, a summary of facts, and the conclusions drawn therefrom.

21   Therefore, the declaration will not be dismissed outright as overly conclusory.  However, some of

22   Mr. Clark's conclusions are speculative and not topics on which expert testimony is needed.  For

23   example, the "obvious motivation" of the officers in their dealings with Mr. Green (i.e., whether

24   they wanted to help him as a "brother" officer) or whether they appear to have been acting in concert

25   are questions appropriate for a jury and no expert assistance is needed.  However, even if Mr.

26   Clark's declaration is considered, it alone does not defeat Deputy Hallman's motion for the reasons

27   discussed below.

28   **III.   PLAINTIFF'S CONFLICTING DEPOSITION TESTIMONY**

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    During the incident, Plaintiff prepared a written statement confirming that there was a "verbal

2    altercation," but not referencing any attack on her.  Gilbert Decl. Ex. B.  Deputy Hallman's

3    recording does not capture any statement by Plaintiff that Mr. Green attacked her.  Two days later,

4    she provided a statement to the police stating that, "I am sorry I did not let you know that Donald

5    restrained and hurt me. I did not want him to be in trouble."  Hernandez Depo. 180; Gilbert Decl.

6    Ex. E.  On April 8, 2008, Plaintiff stated under oath that during the investigation, she "was scared,

7    wanted no more problems but wanted Donald to leave [her] house" so she "chose not to say too

8    much" and "did not describe the physical altercation."  See Gilbert Supplemental Decl. Ex. A

9    (written statement attached to "Request for Order").  Plaintiff further stated under oath that she did

10   not tell officers that Mr. Green physically attacked her during a May 1, 2008 hearing to obtain a

11   restraining order against Mr. Green.  See id. Ex. B (reporter's transcript of proceedings in Napa

12   County Superior Court) at 26 (testified in court that officers kept asking her what happened and she

13   said "nothing").

14   Plaintiff's later deposition testimony is somewhat contradictory as to whether she told the

15   officers on the scene at the time of the incident that Mr. Green attacked her.  See Hernandez Depo.

16   116 (officer asked if she had injuries and she said no), 209 (officers kept asking her what happened

17   and she said "nothing"); but see Hernandez Depo. at 131-132 (told Officer Bender with Deputy

18   Hallman present that Mr. Green attacked her), 135 (told Officer Bender that Mr. Green attacked her,

19   but did not say he "physically attacked" her), 137 (told Officer Bender that Mr. Green attacked her),

20   139-142 (same), 217,  312 (she told Officer Bender that Mr. Green attacked her with Deputy

21   Hallman in the room).  She contends that Deputy Hallman was whistling into the recording while

22   she was making this statement (Hernandez Depo. at 132-33), and the transcript states that "whistling

23   is covering up what LH is saying.  She can be heard in the background, but her speech is

24   unintelligible due to the whistling."  TX 17.  However, it appears that Deputy Hallman was in

25   another room from Plaintiff and she could not fully hear what he was saying, even when not

26   whistling.  See Hernandez Depo. at 328 (she could hear that there was discussion between officers

27   and Mr. Green, but did not specifically know what they were saying and was not paying attention).

28   Deputy Hallman argues that Plaintiff's later deposition testimony that she told Officer Bender

10

that Mr. Green attacked her should be ignored in light of her written statement at the time of the incident that a "verbal altercation" occurred, her written apology days later for not telling officers on the scene that he attacked her, and her later sworn statements that she said nothing when questioned by officers about a physical attack.  See Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806 (1999) ("party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity"); Block v. City of Los Angeles, 253 F.3d 410 (9th Cir. 2001).

In determining whether to consider Plaintiff's later deposition testimony, the question is whether it clearly and unambiguously contradicts prior deposition testimony, was prepared specifically in opposition to a summary judgment motion, and the contradiction has not been explained, such that the Court may consider it a "sham" and refuse to consider it.  See Kennedy v. Allied Mutual Ins. Co., 952 F. 2d 262, 266-67 (9th Cir. 1991).  In Van Asdale v. International Game Technology, 577 F.3d 989, 998-999 (9th Cir. 2009), the Ninth Circuit explained that the doctrine should be "applied with caution," but is required because, "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  Id.  The Ninth Circuit has imposed two limitations on a district court's discretion to invoke the sham affidavit rule: (1) "the district court must make a factual determination that the contradiction was actually a "sham" and (2) "the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit."  Id. at 999.

The doctrine is not limited to affidavits filed in connection with summary judgment papers that contradict earlier deposition testimony, and has been extended to preclude later deposition testimony that contradicts earlier sworn statements.  For example, in Lamb v. Household Credit Services, 956 F.Supp. 1511, 1518 (N.D. Cal. 1997), the court held that a plaintiff's later deposition testimony that contradicted her earlier sworn EEOC testimony failed to create genuine issue of material fact for

11

purposes of summary judgment.  Similarly, in <u>Pacific Ins. Co. v. Kent</u>, 120 F. Supp. 2d 1205, 1213 (C.D. Cal. 2000), the court noted that "courts have also precluded the use of a later deposition testimony to contradict prior sworn testimony," though the rule must be applied with caution.

Plaintiff's later deposition testimony is somewhat contradictory to her earlier sworn statement, but the Court does not finds that it is necessarily a "sham" such that it cannot be considered.  At oral argument, the Court questioned Plaintiff's counsel about the contradiction, and he contended that Plaintiff had suffered a traumatic event and there were other things that occurred the night of the incident that she only later remembered.   Thereafter, Plaintiff filed a "Supplemental Declaration" attaching additional pages of her deposition transcript which may in part further explain the contradiction.  Because the Court does not find that her deposition testimony was necessarily a sham, the Court has considered all of Plaintiff's testimony in coming to its decision.  However, even considering all of Plaintiff's testimony and statements in the light most favorable to her, summary adjudication of her § 1983 wrongful arrest and excessive force claims against Deputy Hallman is warranted.

**III.   ANALYSIS**

　　**1.        Wrongful Arrest and Excessive Force**

Deputy Hallman argues that his actions were "privileged" because there was a reasonable basis for the arresting officers on the scene to conclude that probable cause existed for her arrest.  <u>See Grant v. City of Long Beach</u>, 315 F.3d 1081, 1089 (9th Cir. 2002) (question is whether "at the moment the arrest was made," the facts and circumstances within the officers' knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing the suspect had violated the law); <u>Beier v. City of Lewison</u>, 354 F.2d 1058, 1065 (9th Cir. 2004) (probable cause exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability the [the plaintiff] had committed a crime").  Deputy Hallman contends that Plaintiff's police call came in as a domestic assault, which is governed by California Penal Code § 13701.  This statute provides in pertinent part that the arrest of domestic violence offenders is "encouraged" if there is probable cause that an offense has been committed, and that the officers "shall" make reasonable efforts to

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    identify the dominant (i.e., the most significant) aggressor.  Cal. Penal Code § 13701.

2        Deputy Hallman argues that, while both Ms. Hernandez and Mr. Green were admittedly

3    verbally aggressive, only Mr. Green claimed to have been physically attacked and had physical

4    injuries (scratches on his chest) while Plaintiff repeated that nothing happened and had no injuries

5    other than red marks on her wrists and spit something pink into the sink which she attributed to a dry

6    mouth, though Deputy Hallman suspected that "it got physical." (TX 6).  She alleged that Mr. Green

7    attacked her days later, at which time she apologized for not giving this information to the officers at

8    the scene.  Deputy Hallman argues that it was reasonable for the arresting officers at the scene to

9    conclude that Plaintiff was the dominant aggressor, which required them to arrest Plaintiff.  See Cal.

10   Penal Code § 13701.  Deputy Hallman reasons that, if the arresting officers had probable cause to

11   arrest Plaintiff as the dominant aggressor, there is no § 1983 violation and hence he cannot be liable.

12       Plaintiff does not directly address Deputy Hallman's argument that the arresting officers had

13   probable cause and therefore he cannot be liable, but instead counters that Deputy Hallman's actions

14   are not protected by the doctrine of qualified immunity.  See Harlow v. Fitzgerald, 457 U.S. 800,

15   818 (1962) (qualified immunity protects government officials "from liability for civil damages

16   insofar as their conduct does not violate clearly established statutory or constitutional rights of

17   which a reasonable person would have known.").  Plaintiff argues that Deputy Hallman's actions

18   were not privileged by the doctrine of qualified immunity even though Plaintiff admits that the

19   doctrine "provides ample protection to all but the plainly incompetent or those who knowingly

20   violate the law." Burns v. Reed, 500 U.S. 478, 495 (1991).  Plaintiff cites the qualified immunity

21   standard set forth in Saucier v. Katz, 533 U.S. 194 (2001), which established a mandatory two-step

22   sequential process for resolving claims of qualified immunity.  Under this test, a court was to first

23   consider the threshold question: "Taken in the light most favorable to the party asserting the injury,

24   do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier, 533 U.S. at

25   201 ("In the course of determining whether a constitutional right was violated on the premises

26   alleged, a court might find it necessary to set forth principles which will become the basis for a

27   holding that a right is clearly established.").  Second, "if a violation could be made out on a

28   favorable view of the parties' submissions, the next, sequential step is to ask whether the right was

1    clearly established." Id.

2       However, in Pearson v. Callahan, 129 S. Ct. 808 (2009), the Court receded from Saucier,

3    holding "that the Saucier protocol should not be regarded as mandatory in all cases," but instead

4    judges should exercise their sound discretion as to which of the two prongs of the analysis to address

5    first. Pearson, 129 S. Ct. at 818. In Pearson, the Court determined that the officers in that case were

6    entitled to qualified immunity "on the ground that it was not clearly established at the time of the

7    search that their conduct was unconstitutional" without first deciding whether the facts shown by the

8    plaintiff constituted a violation of a constitutional right. Id. at 813. The standard for qualified

9    immunity is the "'objective legal reasonableness' of the action, assessed in light of the legal rules

10   that were 'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 638

11   (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)). "Therefore, regardless of whether the

12   constitutional violation occurred, the [official] should prevail if the right asserted by the plaintiff was

13   not 'clearly established' or the [official] could have reasonably believed that his particular conduct

14   was lawful." Romero v. Kitsap County, 931 F. 2d 624, 627 (9th Cir. 1991). If Defendants had a

15   reasonable but mistaken belief that their conduct was lawful, qualified immunity applies. Saucier,

16   533 U.S. at 205-6.

17      Plaintiff addresses the first step of the Saucier test and contends that "no reasonable officer had

18   probable cause" to arrest her, but the probable cause to arrest Mr. Green was substantial. However,

19   as permitted by Pearson, the Court need not address the first prong of the Saucier analysis and

20   therefore makes no determination as to Deputy Hallman's first argument; i.e., whether as a matter of

21   law the arresting officers had probable cause to arrest her or whether, in hindsight, her arrest was

22   unconstitutional. The arresting officers have not yet moved for summary judgment and in the

23   context of this motion the Court need not and does not reach the issue of whether there was probable

24   cause to arrest Plaintiff. Even if Plaintiff could establish a violation of her constitutional rights (i.e.,

25   unlawful arrest or excessive force) by the arresting officers – an issue this Court does *not* reach at

26   this time – Plaintiff has not met her burden of creating a triable issue as to whether Deputy

27   Hallman's own conduct in this case was unconstitutional in light of clearly established legal rules in

28   place at the time of the incident. See Kennedy v. Ridgefield City, 439 F.3d 1055, 1065 (9th Cir.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    2006).

2    More specifically, Plaintiff has not shown that her asserted right to have a "cover" officer from

3    another agency, who was admittedly not directly involved in her arrest or the use of force against her

4    and was in another room at the time the arrest occurred, intervene on her behalf based on a non-

5    investigatory discussion with an alleged victim revealing some potentially circumstantial

6    exculpatory information .  Plaintiff has cited no case, and the Court has not located one, where an

7    officer so far removed from the arrest or use of force was found liable for participating in the arrest

8    or failing to intervene in an arrest by others.  Thus, the asserted right was not clearly established at

9    the time of the incident and Plaintiff has not shown that Deputy Hallman could not have reasonably

10   believed that his conduct during Plaintiff's arrest was lawful.  He is therefore entitled to qualified

11   immunity with respect to the wrongful arrest and excessive force claims.

12   Generally, an officer's liability under § 1983 is predicated on his or her "integral participation"

13   in the alleged violation.  Chuman v. Wright, 76 F.3d 292, 294-95 (9th Cir. 1996).  "'[I]ntegral

14   participation' does not require that each officer's actions themselves rise to the level of a

15   constitutional violation."  Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir. 2004).  However, it

16   requires "some fundamental involvement in the conduct that allegedly caused the violation."  See id.

17    The Ninth Circuit recently stated:

18        In Chuman v. Wright, 76 F.3d 292 (9th Cir.1996), we rejected "the 'team
          effort' standard [that] allows the jury to lump all the defendants together,
19        rather than require it to base each individual's liability on his own conduct."
          76 F.3d at 295. In that case, we held that a police officer's "[b]eing a mere
20        bystander [to his colleagues' conduct] was insufficient" to support § 1983
          liability. Id. at 294.
21
          Hopkins seeks to distinguish Chuman by relying on the "integral
22        participant" rule, which, as its name suggests, extends liability to those
          actors who were integral participants in the constitutional violation, even if
23        they did not directly engage in the unconstitutional conduct themselves.
          However, this rule requires more participation and support on the part of a
24        particular defendant than the undisputed facts in this case show Officer
          Nguyen to have provided.  Under the integral participant rule, "an officer
25        who does not enter an apartment, but stands at the door, armed with his gun,
          while other officers conduct the search, can ... be a 'full, active participant'
26        in the search" and therefore can be subject to § 1983 liability. Boyd v.
          Benton County, 374 F.3d 773, 780 (9th Cir.2004) (emphasis added).  Each
27        of the cases cited in Boyd in which the "integral participant" rule was
          deemed satisfied involved officers who "provided armed backup during an
28        unconstitutional search."  Id.  While the "integral participant" rule may
          extend liability beyond simply those officers who provide "armed backup,"

                                              15

**United States District Court**
For the Northern District of California

> it is clear that an officer who waits in the front yard interviewing a witness and does not participate in the unconstitutional search in any fashion cannot be held liable under <u>Chuman</u>.

<u>Hopkins v. Bonvicino</u>, 573 F.3d 752, 770 (9th Cir. 2009); <u>see also</u> <u>Jones v. Williams</u>, 297 F.3d 930, 935 (9th Cir. 2002) ("In <u>Chuman v. Wright</u>, we defined the contours of individual liability further when we stated a plaintiff could not hold an officer liable because of his membership in a group without a showing of individual participation in the unlawful conduct.").

Plaintiff contends that Deputy Hallman's integral participation included: arriving on the scene without having been called, recording what went on during the incident, interviewing and examining Plaintiff's hands and wrists, telling Officer Bender that she had blood in her mouth and did a "wildcat" on Mr. Green, referring to Mr. Green as "brother" and making friendly small-talk with him, failing to book the recording into evidence or write a report about the incident, whistling and making noises into the recording during the questioning of Plaintiff, and not following up on Plaintiff's statement that Mr. Green had a knife or Officer Bender's statement to Plaintiff that Mr. Green did not say she hit him or interceding on her behalf.

She argues that anyone who "causes" one to be subjected to a constitutional deprivation can be liable, not only by direct personal participation, "but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." <u>Johnson v. Duffy</u>, 588 F.2d 740, 743 -744 (9th Cir. 1978). However, Plaintiff does not explain how Deputy Hallman knowingly set in motion a series of events that caused other officers to inflict injury on her. Instead, it is undisputed that he spoke to her for two or three minutes and passed on all of the information he gathered from her to a City of Napa officer, including that it appears to him that she had been injured although she denied a physical altercation, so there is no evidence that he set in motion a series of events leading to her arrest.

Plaintiff also argues that Deputy Hallman was an "integral participant" under the Ninth Circuit decision in <u>Blankenhorn v. City of Orange</u>, 485 F.3d 463, 481 n.12 (9th Cir. 2007). Footnote 12 of the decision states in its entirety:

> Defendants argue that, because Blankenhorn offered no evidence that Montano and Roman had physical contact with him, summary judgment for them was proper. Defendants also argue that, though Kayano helped handcuff Blankenhorn,

16

summary judgment for him was proper because Blankenhorn did not allege he used excessive force in doing so.  An officer's liability under section 1983 is predicated on his "integral participation" in the alleged violation.  Chuman v. Wright, 76 F.3d 292, 294-95 (9th Cir.1996). "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation." Boyd, 374 F.3d at 780. But it does require some fundamental involvement in the conduct that allegedly caused the violation.  See id. (holding that every officer who provided armed backup for another officer who unconstitutionally deployed a flash-bang device to gain entry to a suspect's home could be held liable for that use of excessive force because "every officer participated in some meaningful way" in the arrest and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flashbang was to be deployed").

Roman, who arrived on the scene after the arrest was completed, and Montano, who at most provided crowd control, did not participate in any integral way in the arrest. Therefore, summary judgment in their favor was properly granted.

Kayano's help in handcuffing the prone Blankenhorn was, of course, meaningful participation in the arrest. It is true that Blankenhorn does not claim Kayano used excessive force in handcuffing him, and Ross, not Kayano, placed the ripp-hobbles on Blankenhorn's wrists and ankles. But Kayano's own declaration indicates that his help in handcuffing Blankenhorn was instrumental in the officers' gaining control of Blankenhorn, which culminated in Ross's application of hobble restraints. Therefore, Kayano's participation was integral to the use of the hobble restraints.  See id.  It follows that Gray, who ordered Ross to use the hobble restraints, and Nguyen and South, who tackled Blankenhorn, also participated in an integral way in the application of the hobble restraints.

Accordingly, Gray, Nguyen, Ross, South, and Kayano may be held liable for this particular alleged use of excessive force.  See Chuman, 76 F.3d at 294-95.

Unlike in Blankenhorn, Deputy Hallman did not help handcuff Plaintiff or otherwise restrain her, and admittedly had no direct involvement in her arrest or the use of excessive force.  Notably, the Ninth Circuit did not extend the "integral participation" concept to an officer who arrived on the scene after an arrest was made and another who "at most provided crowd control" but did not participate in the arrest in any integral way, and affirmed summary judgment as to those officers. Deputy Hallman's "involvement," which admittedly was limited to talking to Plaintiff for two to three minutes while serving as a cover officer and passing on the information he gathered to a City of Napa officer, does not rise to the level of integral participation in Blankenhorn or the cases its cites.

Plaintiff's arguments that her rights were violated because Deputy Hallman ignored exculpatory evidence during his role as cover officer and failed to intervene on her behalf despite knowledge that negated probable cause are also unavailing, because she has not shown that her right to have him perform these actions was clearly established.  Plaintiff contends that"the fountain of

17

United States District Court
For the Northern District of California

1  exculpatory evidence that was available yet ignored by Deputy Hallman, if considered by an

2  objectively reasonable investigator, would have negated probable cause to arrest plaintiff and

3  imposed upon Hallman a duty to further investigate." Opp. at 11. She relies on BeVier v. Hucal,

4  806 F.2d 123, 128 (7th Cir. 1986), where the Seventh Circuit held that a police officer may not close

5  her or his eyes to facts that would help clarify the circumstances of an arrest, and therefore an officer

6  arresting parents for child neglect without any evidence of intent (an element of the crime), who

7  failed to question several individuals present at the scene to obtain information about the parents'

8  intent, acted unreasonably. This Seventh Circuit case is not analogous because Deputy Hallman was

9  admittedly not the arresting officer or performing the investigation.

10  Plaintiff also relies on Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th

11  Cir. 2001) for the position that "officers may not solely rely on the claim of a citizen witness that he

12  was a victim of a crime, but must independently investigate the basis of the witness' knowledge or

13  interview other witnesses." Arpin was a motion to dismiss case, and the complaint alleged that the

14  arresting officer refused to identify himself, would not inform the plaintiff of the reason she was

15  being arrested, and did not allow the plaintiff to explain her side of the story prior to arresting her.

16  Id. The Ninth Circuit held that the allegations of the complaint raised an inference that the officers

17  arrested the plaintiff based on an accusers's unexamined charge, and if they did not independently

18  investigate his battery claim, they did not have probable cause to arrest the plaintiff. Id. Plaintiff's

19  Opposition argues that both Ms. Hernandez and Mr. Green denied that anything happened,[3] Mr.

20  Green made inconsistent statements which officers questioned the veracity of, it was Plaintiff's

21  home, Mr. Green had parked his car around the corner and had no property in the house, and he was

22  drunk and standing in his underwear when the officers arrived – so there was more cause to arrest

23  Mr. Green than Plaintiff. Opp. at 12. Plaintiff also argues that Deputy Hallman failed to investigate

24  because he did not even know what kind of call he was responding to when he went to provide cover

25  and he did not bother to ascertain who called the police for help.

26

27  _____

28  [3] This is inconsistent with her deposition testimony and argument elsewhere that she told Officer Bender that Mr. Green attacked her, but is consistent with her written statement at the time of the incident and statements in restraining order proceedings in the following days that she told officers nothing happened.

United States District Court
For the Northern District of California

1      <u>Arpin</u> is distinguishable in this context because it is undisputed that Deputy Hallman was not

2  the arresting officer, and therefore it sheds no light on his duty to investigate.  Further, it is

3  undisputed that the arresting officers examined both Ms. Hernandez and Mr. Green, and the arrest

4  was not based solely on Mr. Green's accusation but also after questioning Plaintiff, who stated orally

5  and in writing that nothing happened other than a verbal altercation (though she later testified that

6  she told Officer Bender that Mr. Green attacked her), and in light of scratches on Mr. Green's body

7  and his written statement that Plaintiff attacked him.  Therefore, and while the Court makes no

8  determination as to the reasonableness of Officer Bender or any other arresting officer's actions,

9  <u>Arpin</u> and similar cases relating to a complete failure to investigate are inapposite.[4]

10      In connection with her argument that Deputy Hallman violated her rights by ignoring

11  exculpatory evidence, Plaintiff also relies on <u>Broam v. Bogan</u>, 320 F.3d 1023, 1031 (9th Cir. 2003),

12  a case involving the propriety of an officer's investigation of a child's sexual abuse allegations.  The

13  Ninth Circuit reversed a lower court's dismissal with prejudice, finding that the plaintiff might be

14  able to amend the complaint to include the dates of the alleged events, which would in turn

15  determine whether absolute or qualified immunity was applicable, and therefore whether the claims

16  were viable based on a failure to consider exculpatory evidence.  <u>Broam</u>, decided on a motion to

17  dismiss, did not reach the issue of whether exculpatory evidence made the plaintiff's arrest or the

18  officer's actions objectively unreasonable, and does not show that under clearly established law,

19  Deputy Hallman would have known that his actions were unreasonable or would be unlawful.

20      Plaintiff also argues that Deputy Hallman's failure to intercede in Plaintiff's arrest renders him

21

22      [4]Deputy Hallman also argues that a police officer generally does not owe a duty of care to
protect members of the public unless a special duty is established.  For this position, he relies on

23  <u>Davidson v. City of Westminster</u>, 32 Cal. 3d 197 (1982), where the California Supreme Court held that
the police surveilling a laundromat did not have a duty to warn the plaintiff where the were not

24  responsible for her presence or that of her attacker, and their surveillance did not change the conduct
of anyone involved.  Unlike in <u>Davidson</u>, here Plaintiff called the police for help, Deputy Hallman

25  voluntarily responded and entered her house, and Plaintiff presumably relied on the police for
protection.  Therefore, this case is not on point.  However, even if Deputy Hallman owed Plaintiff some

26  duty as a result of responding to her call, it does not follow that he was required to independently
investigate the incident to obtain exculpatory evidence for her while the City of Napa officers were

27  simultaneously investigating.  <u>See Williams v. State of California</u>, 34 Cal. 3d 18, 27-28 (1983) (highway
officer's voluntary stop to assist motorist did not create duty to investigate).  At oral argument, Deputy

28  Hallman also argued without elaboration that the "cumulative knowledge" doctrine would trump any
duty Deputy Hallman might have had to investigate.  However, because this new argument was made
not in his papers, the Court has not considered it.

United States District Court
For the Northern District of California

1    liable even though he did not handcuff her.  See Cunningham v. Gates, 229 F.3d 1271, 1289 (9th

2    Cir. 2000) (police officers have a duty to intercede when their fellow officers violate the

3    constitutional rights of a suspect or citizen if they had an opportunity to intercede); U.S. v. Koon, 34

4    F.3d 1416, 1447, n. 25 (9th Cir. 1994).  In Cunningham, police officers shot several criminal

5    suspects in separate incidents.  The Ninth Circuit concluded that officers who were not present at the

6    time of the shootings could not be liable under § 1983 for failure to intercede, nor could the

7    non-shooting officers who were present but had no realistic opportunity to intercede, according to

8    the undisputed evidence.  These cases addressed uses of force – shooting and beating –  much more

9    severe than the allegedly overly tight handcuffs alleged here.  Since Deputy Hallman was admittedly

10   not personally involved in or present for Plaintiff's arrest, including the use of allegedly excessively

11   tight handcuffs, he had no opportunity intervene and therefore it was not clearly established that he

12   had a duty to do so.

13       Plaintiff similarly relies on Gagnon v. Ball, 696 F.2d 17 (2d Cir. 1982), where the Second

14   Circuit rejected an officer's argument that he should not be liable for an unlawful arrest for failure to

15   intervene.  Id. at 21.  Though unclear, it appears that in Gagnon, Officer Ball got out of the car,

16   disarmed the suspect and arrested her, and that both Officer Ball and Officer Lapalca transported her

17   to the station.  Id. at 19.  Without explanation or further discussion of the relevant facts, the court

18   held that "Officer Lapalca not only declined to intercede on Ms. Gagnon's behalf but also assisted

19   Officer Ball in detaining her.  This participation in an unlawful arrest suffices to support the jury's

20   verdict against Officer Lapalca."  Id.  It is unclear but appears that this case is not analogous to

21   Plaintiff's situation because it is undisputed that Deputy Hallman did not assist in detaining her or

22   transporting her to the station, but was a bystander in another room while her arrest was taking

23   place.

24       Plaintiff contends that Deputy Hallman was more than a bystander and had a duty to intervene

25   and stop Plaintiff's arrest because he knew Mr. Green was intoxicated in his underwear in Plaintiff's

26   house, inquired as to why he parked around the corner, and knew Mr. Green was giving inconsistent

27   answers and thought he was guarding information.  However, this information (some of which was

28   obtained after Plaintiff's arrest) does not show that Deputy Hallman knew Plaintiff's civil rights

1   were being violated or had an opportunity to intervene.  Instead, the evidence shows that he was not

2   in the room at the time of Plaintiff's arrest, and was in another room making small talk with the

3   other officers and Mr. Green.  Under these circumstances, Plaintiff had no clearly established right

4   to have Deputy Hallman intervene, and he could have reasonably concluded that he had no duty to

5   intervene.

6         In sum, the cases cited by Plaintiff are unhelpful in clearly establishing the unreasonableness of

7   Deputy Hallman's actions, because they do not involve an officer uninvolved in an arrest who was

8   simply providing "cover" for another law enforcement agency in a domestic violence situation

9   where he did not make any probable cause determination or actively participate in the arrest, and/or

10  where an alleged victim had accused the plaintiff of attacking him and had physical marks on him

11  while the plaintiff stated that she was not injured and nothing had happened.  Therefore, Plaintiff has

12  not shown that the right in question was "clearly established" or that Deputy Bender could not have

13  reasonably believed that his particular conduct was lawful.

14        In addition to caselaw, Plaintiff also relies heavily on her retained expert Roger Clark's

15  declaration, in which he concludes that: "Deputy Hallman ignored the compelling and obvious

16  exculpatory evidence regarding Ms. Hernandez, and the obvious inculpatory evidence that Officer

17  Green was a criminal suspect. . . . The Defendant Officers appear in the record as all having a direct

18  involvement in this incident and having deliberately acted contrary to the legal and ethical

19  professional requirements in this set of facts.  Their actions included Ms. Hernandez's false arrest

20  and booking . . ."  Clark Decl. ¶ 9.  As discussed above, Deputy Hallman challenges Mr. Clark's

21  declaration as impermissibly conclusory and full of legal conclusions, and the portion of his

22  declaration relating to the question of whether Deputy Hallman could have reasonably believed that

23  his particular conduct was lawful is a legal question that does not require or benefit from expert

24  opinion.  For the reasons discussed above, the Court finds that Deputy Hallman could have

25  reasonably believed that his conduct was lawful.  Deputy Hallman is therefore entitled to qualified

26  immunity as to the unlawful arrest and excessive force portions of the § 1983 claim, and his motion

27  is GRANTED as to these  issues.

28        Because the Court grants this portion of the motion on the basis of qualified immunity, it need

21

United States District Court
For the Northern District of California

1   not address Deputy Hallman's alternative argument that he was not sufficiently involved in

2   Plaintiff's arrest or the alleged excessive force used against her to be liable for her § 1983 claim.

3   However, the Court notes that it is undisputed that Deputy Hallman was uninvolved in the decision

4   to arrest Plaintiff or the act of arresting or handcuffing her.  Therefore, Deputy Hallman's argument

5   that he did not "integrally participate" in any alleged unlawful arrest or excessive force violation is

6   persuasive and might otherwise be dispositive.  See Chuman v. Wright, 76 F.3d 292, 294-95 (9th

7   Cir. 1996).

8          **2.          Conspiracy Claim**

9          "A civil conspiracy is a combination of two or more persons who, by some concerted action,

10  intend to accomplish some unlawful objective for the purpose of harming another which results in

11  damage."  Vieux v. East Bay Reg'l Park Dist., 906 F.2d 1330, 1343 (9th Cir. 1990) (citation and

12  internal quotation marks omitted).  The Ninth Circuit has stated:

13          To establish the defendants' liability for a conspiracy, a plaintiff must
            demonstrate the existence of "'an agreement or 'meeting of the minds' to
14          violate constitutional rights.' " [citations omitted]  The defendants must
            have, "by some concerted action, intend[ed] to accomplish some unlawful
15          objective for the purpose of harming another which results in damage."
            [citations omitted]  Such an agreement need not be overt, and may be
16          inferred on the basis of circumstantial evidence such as the actions of the
            defendants. [citation omitted] For example, a showing that the alleged
17          conspirators have committed acts that "are unlikely to have been undertaken
            without an agreement" may allow a jury to infer the existence of a
18          conspiracy. [citation omitted] Whether defendants were involved in an
            unlawful conspiracy is generally a factual issue and should be resolved by
19          the jury, "so long as there is a possibility that the jury can 'infer from the
            circumstances (that the alleged conspirators) had a 'meeting of the minds'
20          and thus reached a understanding' to achieve the conspiracy's objectives."
            [citations omitted]  "To be liable, each participant in the conspiracy need not
21          know the exact details of the plan, but each participant must at least share
            the common objective of the conspiracy." [citation omitted].

22

23  Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999).

24          Deputy Hallman argues that Plaintiff's conspiracy claim fails as a matter of law because it does

25  not meet the heightened standard required by Harris v. Roderick, 126 F.3d 1189, 1195 (9th Cir.

26  1997).  In Harris, the Ninth Circuit held that, "In order to survive a motion to dismiss, plaintiffs

27  alleging a conspiracy to deprive them of their constitutional rights must ' include in their complaint

28  nonconclusory allegations containing evidence of unlawful intent or face dismissal," supported by

1    direct or circumstantial evidence.  Id.  The Court found that the plaintiff's complaint was sufficient

2    because it was "detailed and specific" and "pleads with particularity as to which defendants

3    conspired, how they conspired and how the conspiracy led to a deprivation of his constitutional

4    rights, even though he does not identify which officer said or did what at which particular time."  Id.

5    Without elaboration or citation to the record, Deputy Hallman argues that Plaintiff's complaint fails

6    to adequately plead a conspiracy under this standard, and the evidence obtained in discovery also

7    does not support a conspiracy claim.

8         Paragraph 18 of the complaint alleges that "Officer Green conspired with and willfully

9    participated in a joint action with Defendant Officers and Deputy Hallman to deprive Plaintiff

10   Hernandez of her Fourth Amendment right to be free from unreasonable search and seizure by

11   agreeing that Officer Green would claim to be a victim of battery and participate in the false arrest of

12   Plaintiff Hernandez while Green would be driven elsewhere."  Paragraph 25(c) of the complaint

13   alleges that Deputy Hallman, Officer Bender and Mr. Green acted in concert by agreeing to fabricate

14   criminal charges against Plaintiff, and meeting and constructing a false story about what happened in

15   Plaintiff's home designed to conceal Mr. Green's break-in of Plaintiff's home.  These allegations

16   have already survived a motion to dismiss this claim as to Deputy Hallman.  See Oct. 22, 2009 Order

17   on Motion to Dismiss at 8-9.

18        Plaintiff points to evidence that she contends establishes that Mr. Green, and not Plaintiff,

19   should have been arrested.  She also argues that Deputy Hallman referred to Mr. Green as "brother"

20   and made small talk with him, knew he was a Napa State Hospital officer, knew he did not give the

21   same written statement that he gave orally, and together with Officer Bender used the word

22   "teamwork" after the decision to arrest Plaintiff was made.  Plaintiff also relies on her expert Mr.

23   Clark's declaration, where he concludes that the defendants' motivation was to protect Mr. Green, a

24   fellow law enforcement officer.  Clark Decl. ¶ 9(a).  Such circumstantial evidence can support an

25   inference of conspiracy.  See Mendocino Environmental Center, 192 F.3d at 1301.  Plaintiff

26   separately argues that Deputy Hallman is not protected by qualified immunity from Plaintiff's

27   conspiracy claim because of the "numerous facts which demonstrate Hallman's integral participation

28   with Bender in the false arrest of Ms. Hernandez in order to protect a "brother" officer and his

23

United States District Court
For the Northern District of California

1   agreement to use "teamwork" to cover-up Green's crimes." Opp. at 22.

2       Deputy Hallman does not directly address these facts, perhaps acknowledging that it would

3   require some weighing of the evidence to make a determination about the import of the use of the

4   terms "brother" and "teamwork" and Deputy Hallman's friendly attitude toward Mr. Green, so

5   summary judgment is unavailable.  Instead, Deputy Hallman argues that he cannot be liable under a

6   conspiracy theory for performing acts authorized by law.  See Cal. Govt. Code § 821.6 (bars liability

7   for injury caused by prosecution of judicial proceeding, including investigation); § 820.6 (protects

8   government employees for discretionary activities).  At oral argument, Deputy Hallman contended

9   briefly that these statutes mean that even intentional acts are allowed, and that the question under

10  federal law is whether the officers should have known that their actions were wrong under

11  applicable law, including these state law provisions.  As discussed above, Deputy Hallman is

12  entitled to qualified immunity for the unlawful arrest and excessive force claims where he

13  admittedly did not participate in the arrest or use of force, but the analysis is different for the

14  conspiracy claim.  If he did engage in a conspiracy to arrest Plaintiff and not Mr. Green, it is clear

15  under established law that such a conspiracy would be unlawful and he would have known it was.

16      At oral argument, Deputy Hallman also argued that Plaintiff's conspiracy claim fails as a

17  matter of law because there is no triable issue of fact as to the underlying civil rights violations and

18  there was probable cause to arrest Plaintiff as the "dominant aggressor."  However, the arresting

19  officers have not yet moved for summary judgment and, as discussed above, the Court need not and

20  does not reach the issue of whether there was probable cause to arrest Plaintiff at this point in the

21  litigation. However, the City of Napa defendants have informed the Court that they intend to move

22  for summary judgment at a later date.  If, at that time, the Court grants summary judgment in their

23  favor on the issue of whether there was an underlying constitutional violation, then Deputy

24  Hallman's argument with respect to the conspiracy claim may have merit.  The Court therefore

25  DENIES summary adjudication of Plaintiff's conspiracy claim without prejudice to Deputy

26  Hallman's ability to request that the Court reconsider this very limited issue following a ruling on

27  the City of Napa Defendants' summary judgment motion.

28      For all of the foregoing reasons, Deputy Hallman's Motion is GRANTED IN PART AND

1   DENIED IN PART.

2        **IT IS SO ORDERED.**

3

4   Dated: October 13, 2010

5                                      ELIZABETH D. LAPORTE
                                       United States Magistrate Judge

United States District Court
For the Northern District of California