1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LUZ HERNANDEZ,                                  No. C-09-02782 EDL

       Plaintiff,                          **ORDER GRANTING IN PART AND**
                                                **DENYING IN PART CITY OF NAPA**
 v.                                             **AND OFFICER BENDER'S MOTION**
                                                **FOR SUMMARY JUDGMENT;**
CITY OF NAPA, et al.,                           **DENYING COUNTY OF NAPA DEPUTY**
                                                **SHERIFF HALLMAN'S REQUEST FOR**
       Defendants.                        **SUMMARY JUDGMENT OF**
                                                **CONSPIRACY CLAIM; DENYING**
_____/              **MOTION TO STRIKE**

      This action arises out of Plaintiff Luz Hernandez's arrest on April 1, 2008 following an

altercation with her ex-boyfriend Donald Green and police officers from the City of Napa and the

Napa County Sheriff's Department's response to a report of domestic violence.  Plaintiff's Second

Amended Complaint asserts various state law torts claims and claims for violation of her civil rights

under § 1983 by members of the Napa City Police Department and the Napa County Sheriff's

Department.  The Court has previously granted in part the Napa County Defendant's motion for

summary judgment, leaving only Plaintiff's claim for conspiracy against Napa County Deputy

Sheriff Hallman.  Before the Court is Defendants City of Napa, Napa Police Chief Melton and

Officer Bender's (collectively the "City Defendants") Motion for Summary Judgment or Partial

Summary Judgment.  Napa County Deputy Sheriff Hallman has filed a joinder to the motion, and

moves for summary adjudication of the conspiracy claim against him, thereby terminating the action

as to the County Defendants.  For the following reasons, the Court hereby GRANTS IN PART AND

1   DENIES IN PART the City Defendants' motion; DENIES Deputy Bender's motion; and DENIES

2   Plaintiff's motion to strike.

3   **I.       Factual Background**

4          On April 1, 2008, Plaintiff Luz Hernandez and her former boyfriend Defendant Donald

5   Green, who is or was a Napa State Hospital security officer, were involved in an altercation in her

6   home.  Second Amended Complaint ("SAC") ¶ 10.  Plaintiff and Mr. Green had been in an on-and-

7   off dating relationship since 2006 or 2007 and he had stayed at her house at times during their

8   relationship.  Fox Decl. Ex. H (Hernandez Depo.) at 71-72.  On April 1, Plaintiff left work before

9   10:00 p.m. so that she would have time to get home before Mr. Green's shift ended at 10:00 p.m.

10  SAC ¶ 11.  When she arrived home, Ms. Hernandez found Officer Green in her house wearing only

11  his underwear.  Hernandez Depo. at 87-88.  He appeared to be intoxicated and stumbling and "had

12  to bounce himself off from wall to wall."  Hernandez Depo. 89-90.  He was bleeding from what

13  looked like a mole he had tried to cut with a pair of scissors.  Hernandez Depo. 152-53.  Mr. Green

14  stumbled towards Plaintiff, tried to hug her and stated that he wanted to talk to her.  SAC ¶ 13;

15  Hernandez Depo. at 89-90.  Plaintiff ran to the front door, but Mr. Green grabbed her from behind

16  with both of his hands.  SAC ¶ 13; Hernandez Depo. 90-93.  Plaintiff tried to get away, and told Mr.

17  Green that she wanted him to leave.  SAC ¶ 13; Hernandez Depo. at 95.  Plaintiff telephoned 911

18  while yelling "get the f*#% out of my house," during which Mr. Green slapped the telephone from

19  her hands.  SAC ¶ 13; Hernandez Depo. 102.  After this, Plaintiff started hitting Mr. Green and

20  punching his chest with as much force as she had, as well as kicking, screaming and shouting.  SAC

21  ¶ 13; Hernandez Depo. at 105-106, 153-154.

22         As a result of Plaintiff's 911 call, the dispatcher assigned City of Napa Officer Bender and

23  two other City of Napa officers to Plaintiff's residence.  Officer Bender knew by the time he arrived

24  at Plaintiff's door that there was an argument and a hangup call and someone had called for help.

25  Fox Decl. Ex. I (Bender Depo.) at 47-48.  He was aware at some point that a female voice had said

26  "get the f*#% out of my house."  Bender Depo. at 47-48.  Officer Bender did not ask dispatch to

27  check for previous incidents of domestic violence calls to Plaintiff's residence.  Bender Depo. 56.

28  Officer Bender ran a warrants report for Plaintiff after he arrested her.  Bender Depo. at 55.

**United States District Court**
For the Northern District of California

2

United States District Court
For the Northern District of California

1    Deputy Sheriff John Hallman of the Napa County Sheriff's Department heard the dispatch

2    call, determined that he was closer to Officer Bender than the other two officers, and volunteered to

3    respond to provide "cover" to Officer Bender until the two other officers could get there.  Fox Decl.

4    Ex. J (Hallman Depo.) at 65.  When Deputy Hallman arrived on scene, he could not "remember

5    exactly what the call was, but [that] it was something – either 911 hang-up or 415 family

6    disturbance, something to that effect."  Hallman Depo at 88.  When he first arrived, Deputy Hallman

7    did not inquire as to who called the police.  Hallman Depo 89.  Upon arrival at Plaintiff's residence,

8    Deputy Hallman activated a digital recording device worn on his person to record the incident.

9    Hallman Depo. at 90.  Following the incident, Deputy Hallman did not book the recording into

10   evidence or provide it to Officer Bender and did not write a report regarding the incident.  Hallman

11   Depo 58, 63-65, 91.  However, the recording was maintained and has been previously produced in

12   this litigation.[1]  Officer Bender had an audio recording device with him at the time of the incident

13   but did not use it out of habit.  Bender Depo. at 35-36, 40-41.

14   As Deputy Hallman and Officer Bender approached Plaintiff's house, they heard yelling

15   inside.  SAC ¶ 15; Bender Depo. at 197-98; Hallman Depo. at 117.  Mr. Green answered the door

16   dressed only in boxer shorts and bleeding.  Bender Depo. at 62; Hernandez Depo. at 109-110, 206-

17   207.  Mr. Green had scratches on his chest.  Bender Depo. at 132-134; Hallman Depo. at 103-104,

18   130-131. Upon entering Plaintiff's residence, Deputy Hallman and Officer Bender separated

19   Plaintiff and Mr. Green, and Deputy Hallman escorted Plaintiff to her bedroom.  SAC ¶ 15, Hallman

20   Depo. 72-73; Hernandez Depo. 134.  Deputy Hallman's contact with Plaintiff in her bedroom lasted

21   two to three minutes.  Hernandez Depo. at 316, 319.  When Deputy Hallman asked Ms. Hernandez,

22   "What are you fighting about?" Ms. Hernandez replied: "He came into my bedroom."  TX 3-4.

23

24   [1] The recording is somewhat inaudible and Plaintiff retained an expert to enhance, clarify and
     transcribe the recording.  See Dkt. #111 at Gilbert Decl. Ex. A in Support of County Of Napa's Motion

25   for Summary Judgment (CD and transcript of recording).  As discussed below, Plaintiff seeks to have
     the Court consider the transcript in connection with this motion by way of a "Request for Judicial

26   Notice."  The Court has previously listened to the recording and reviewed the transcript, and found these
     items helpful in determining the chronology of events.  However, the accuracy of a portion of the

27   transcript (page 6 line 20 regarding Mr. Green having a knife) is now challenged, and the Court
     therefore does not take judicial notice of that portion of the transcript.  The Court has considered the

28   unchallenged portions of the transcript, most of which are corroborated by deposition testimony
     confirming their accuracy.

1  Rather than following up on this response, Deputy Hallman introduced himself and asked Ms.

2  Hernandez her name.  TX 4.  Deputy Hallman gathered basic information such as Plaintiff's name

3  and date of birth.  Hallman Depo. 73-74; Hernandez Depo. 113-116, 315-316.  Plaintiff stated that

4  she owned the house and had been in a dating relationship with Mr. Green.  Hallman Depo. at 73.

5  Plaintiff went to the bathroom to rinse and spit in the sink, but did not see whether she spit

6  something pink into the sink and did not know if she had an injury to her mouth.  Hernandez Depo.

7  at 116, 147, 148.  Deputy Hallman thought he saw her spit something pink which could be blood and

8  asked her about it.  Hallman Depo. at 74, 85, 87.  Plaintiff told Deputy Hallman that "nothing

9  happened" and she was not injured.  Hernandez Depo. 116, 198; Hallman Depo. at 74, 87.  Deputy

10  Hallman also asked to see her hands and wrists because he thought he observed a red mark on one

11  wrist and was investigating whether or not Ms. Hernandez had any injuries.  Hallman Depo. at 83.

12  Deputy Hallman told Officer Bender that Plaintiff spit something that appeared to be pink

13  into the sink, as well as information about her wrists, and told Officer Bender that the fight appeared

14  to have gotten physical.  Bender Depo. at 90; Hallman Depo. at 85-86, 88, 102, 118-119, 126.  After

15  Deputy Hallman left the room, Plaintiff told another officer (not Officer Bender or Deputy Hallman)

16  that Mr. Green was shaking and mishandling her.  Hernandez Depo. at 118-120.

17  Officer Bender also spoke with Plaintiff to try to determine what had happened.  Bender

18  Depo. at 83-84.  She was fully clothed, wearing a long sleeve sweater and long pants.  Bender Depo.

19  at 74; Hernandez Depo. at 87-88.  Officer Bender asked Plaintiff if she had been hit in the mouth

20  and she did not say anything.  Bender Depo. at 66.  Officer Bender examined Plaintiff's mouth with

21  his flashlight and did not see any injuries inside her mouth.  Bender Depo. at 90-91; Hernandez

22  Depo. at 148.  Plaintiff never stated that she had any injury in her mouth, she did not believe she was

23  injured and did not know why he was looking in her mouth.  Bender Depo. at 92; Hernandez Depo.

24  at 148-50.  Officer Bender also looked at Plaintiff's wrists but did not note any injury, and Plaintiff

25  did not see any marks on her wrists.  Bender Depo. at 66; Hernandez Depo. at 301-302.  Officer

26  Bender did not ask Mr. Green whether he hit Plaintiff or about her wrists.  Bender Depo. at 66-67.

27  Plaintiff never told Officer Bender or Deputy Hallman that Mr. Green grabbed her or

28  physically assaulted her, she did not tell them she was injured, she did not have any visible injuries,

4

**United States District Court**
For the Northern District of California

1    and she did not show them any physical condition that she thought might be an injury or ask for

2    medical treatment.  Hernandez Depo. at 123-125, 139, 142, 144, 199, 302.  When questioned by

3    Officer Bender, Plaintiff repeated that "nothing happened" and she was not injured.  Bender Depo.

4    at 66, 72, 83, 107-108, 148; Hernandez Depo. 116 (officer asked if she had injuries and she said no),

5    207-209 (officers kept asking her what happened and she said "nothing").  She did, however, tell

6    them that Mr. Green attacked her.  Hernandez Depo. at 131-132 (she told Officer Bender with

7    Deputy Hallman present that Mr. Green attacked her), 135 (told Officer Bender that Mr. Green

8    attacked her, but did not say he "physically attacked" her), 137 (told Officer Bender that Mr. Green

9    attacked her), 139-142 (same), 217, 312 (she told Officer Bender that Mr. Green attacked her with

10   Deputy Hallman in the room).  Plaintiff's refusal to answer questions caused Officer Bender to

11   believe she was hiding something and possibly guilty of criminal conduct.  Bender Depo. at 72-73,

12   84-85.  Officer Bender photographed Plaintiff, and the photographs do not show any injury to

13   plaintiff.  Bender Depo. at 103-104; Hernandez Depo. at 130-31, 138.

14        Plaintiff asked Officer Bender whether Mr. Green was claiming she had hit him, and Officer

15   Bender told her he had not made such claims.  Bender Depo. at 106, 116-18; Hernandez Depo. at

16   125, 136, 142-43.  Deputy Hallman was present for that exchange.  Hernandez Depo. at 16-17.  The

17   fact that Ms. Hernandez asked Officer Bender if Mr. Green had accusing her of hitting him had no

18   significance in Officer Bender's mind and played no role in his decision to arrest Plaintiff.  Bender

19   Depo. 109.

20        During the incident, Plaintiff prepared a written statement confirming that there was a

21   "verbal altercation," but not referencing any physical altercation or attack on her, even though she

22   understood Officer Bender wanted her to write what had happened from the beginning of the

23   incident to the end.  Hernandez Depo. Ex. 5; Bender Depo. at 140-41.  Plaintiff initially wrote the

24   word "physical" before altercation and then scratched it out and replaced it with "verbal" before

25   Officer Bender saw what she had written.  Hernandez Depo. at 154-162.  Officer Bender never

26   asked Plaintiff why she scratched out the word "physical" in her written statement, or asked her

27   whether she was acting in self-defense.  Bender Depo. at 74, 141.

28        While speaking with Mr. Green, Officer Bender noted that he smelled of alcohol, his speech

United States District Court
For the Northern District of California

was slightly slurred and it appeared he had been drinking. Bender Depo. at 63. Mr. Green was evasive and answered questions only after repeated questioning. Bender Depo. at 71. Officer Bender believes it is common for perpetrators to be evasive, not answer questions, give inconsistent statements, lie to the police, and commit crimes while intoxicated. Bender Depo. at 85-86. Mr. Green told Officer Bender that he and Plaintiff were in an on and off relationship and had previously lived together. Officer Bender did not ask Mr. Green how he got into Plaintiff's house or if he was a trespasser even though Officer Bender learned that Mr. Green did not live there and that the only clothing he had there was his uniform. Bender Depo. at 63-65, 78-82. Officer Bender was aware of a citizen's right to eject a trespasser from her home and the right to use self-defense against another person. Bender Depo. at 82.

Mr. Green initially stated that, "It didn't get physical" and "hasn't gotten violent." TX 6; Bender Depo. at 77. Officer Hallman responded in Officer Bender's presence, "No, it got physical. She's – she's got marks on her too." Id. Officer Bender never asked Mr. Green if he hit Plaintiff in the mouth, and did not obtain an explanation as to why she had a red substance in her mouth. Bender Depo. 66, 92. Mr. Green told Officer Bender that he had apologized to Plaintiff, and Officer Bender did not ask why. Bender Depo. at 87. Officer Bender does not believe it is common for perpetrators to apologize to their victims. Bender Depo. at 87. Mr. Green told Officer Bender that they had gotten into an argument about their relationship and Plaintiff had pushed and shoved him, scratching his chest and arm. Bender Depo. at 68-70, 134-137. Mr. Green denied striking or physically assaulting plaintiff. Bender Depo. at 70.

Officer Bender asked Mr. Green to write a detailed statement about what happened, and Mr. Green was reluctant to write all of what he had told Officer Bender because he was embarrassed and he did not want himself or Plaintiff to get into any trouble. Bender Depo. at 70-72, 102-103, 113-116, 122-124; Hallman Depo. at 136. Mr. Green initially wrote a statement that did not coincide with his oral statement. Bender Depo. at 71. Officer Bender asked Mr. Green about the inconsistency, and wanted him to either hand over the statement or have it match his earlier oral statement. Bender Depo. at 126-28. Mr. Green pleaded, "I mean, Officer Bender," and Officer Bender responded, "I don't think I need to hear all that." Bender Depo. at 126. In connection with

his written statement, Officer Bender asked Mr. Green if that was how he got scratched and Green said, "I suppose so."  Bender Depo. at 137-38.  Officer Bender then asked Mr. Green, "So is this when she --" and Mr. Green interrupted by saying, "she yells and pushed me."  Bender Depo. at 138.  Officer Bender then asked, "You gonna write that in there that, 'she yells, and pushed me?'" Bender Depo. at 138-39.  Mr. Green then prepared a written statement stating that Plaintiff yells and pushes him and attacked him.  Bender Depo. at 71-72, Ex. 9; see also Hernandez Depo. at 153 (she remembers punching him).

While Deputy Hallman was standing in the front of Plaintiff's house after being relieved by Officer Bender, who took over speaking to Plaintiff, he communicated with Mr. Green and other officers.  Deputy Hallman repeatedly referred to Mr. Green as "brother."  TX p. 4:2-13; 8:21;8:24, 9:6; 13:25; 13:27; 18:20.  During their conversation, Deputy Hallman stated to Mr. Green that he should "think about your whole career cuz this could be – this could change your career and end it."  TX 9:1-2.  Deputy Hallman later joked, "I'm going to have you get some clothes, and you need to get the hell out of here."  Hallman Depo. at 144.  Deputy Hallman was told that Mr. Green did not have any other clothes but his uniform at Ms. Hernandez's house, nor did Deputy Hallman see any other indication that he lived there.  Hallman Depo. 143.

Deputy Hallman's recording captured portions of Officer Bender discussing taking Ms. Hernandez's photograph, while Deputy Hallman was whistling into the recording.  Hallman Depo. 151-52.  During his deposition, Deputy Hallman acknowledged that he could hear himself creating some sort of music or noise, and stated that the recording "is what it is."  Hallman Depo. 158. Deputy Hallman again made noises into the recording, and then Ms. Hernandez asked, "Is he saying I hit him?," and then a male voice began speaking and trailed off.  Hallman Depo. 160-161.  Deputy Hallman said something like "anytime you have to stop and say, 'I'm not going to go into that,' that many times again is a clue."  Hallman Depo. 161-162.  Deputy Hallman believed that since Mr. Green said that he did not want to discuss certain issues, this indicated that there was likely something important and worth discussing that Mr. Green was guarding.  Hallman Depo. 162, 164, 165.  Deputy Hallman did not believe Mr. Green was being forthcoming about what happened in the incident.  Hallman Depo. 164-65, 169.  There is no evidence that Deputy Hallman relayed this

1  opinion to Officer Bender.

2      During his deposition, Deputy Hallman listened to the recording and identified a

3  conversation between Officer Bender and Mr. Green where Officer Bender asked Mr. Green, "do

4  you want to tell the truth?," and Deputy Hallman testified that this would raise the issue of Mr.

5  Green's truthfulness.  Hallman Depo. 174.  Mr. Green's initial unwillingness to provide a written

6  statement would lead Deputy Hallman to believe that Mr. Green was withholding information.

7  Further, if Mr. Green provided Officer Bender a statement that differed from his previous oral

8  statement, this would also raise credibility questions in Deputy Hallman's mind.  Hallman Depo.

9  174-77.  Deputy Hallman identified four instances where Mr. Green's truthfulness was put into

10  question, and he did not intervene in the investigation or Plaintiff's arrest and say that further

11  investigation was necessary.  Hallman Depo 180.  Deputy Hallman's recording captured Officer

12  Bender saying, "You don't live here, and she indicated to me earlier that she wanted you to leave

13  and she wanted to go to bed, so her wish is that you leave. You need to leave."  Hallman Depo. at

14  185-87. Although Deputy Hallman heard a recording of Mr. Green saying "I apologize to you guys.

15  It was my own fault," he had no concern that the wrong person was being arrested because the

16  relationship was volatile in nature.  Hallman Depo 191-192.  Deputy Hallman did not check to see if

17  there had been previous calls related to violence at the residence, and he did not know if any other

18  officers made this inquiry.  Hallman Depo. 193.

19      Deputy Hallman did not relate much of his conversation with Mr. Green to Officer Bender

20  because he thought it was chit-chat and not part of the investigation: "I did not tell Bender, or

21  Officer Bender everything that went on between – with me chitchatting because I chatted about kids,

22  I think a contract at Napa State Hospital that was going to take place, different beers. I chatted with

23  him about telling him Hey, you need to tell the truth, you're held to a standard kind of stuff.  So no, I

24  didn't get into all our chitchat with Officer Bender."  Hallman Depo. 71.  However, Deputy Hallman

25  told someone that Mr. Green looked like Ms. Hernandez did a "wildcat on" him, by which he meant

26  that Mr. Green "looked like he picked up a feral cat," but he did not ask Mr. Green how he was

27  scratched because he did not interview him.  Hallman Depo. at 130-31.

28      Officer Bender testified at his deposition that, based upon the visible injuries to Mr. Green's

8

United States District Court
For the Northern District of California

chest, Plaintiff's refusal to explain what had happened and her claims that they only had a verbal argument, he determined that Plaintiff was the dominant aggressor in the incident and that there was probable cause to arrest her for domestic violence against Mr. Green.  Bender Depo. at 84, 111-12.  Plaintiff was arrested for a misdemeanor violation of Penal Code § 243.  Bender Depo. at 201-203, 206-208.  As Plaintiff was being arrested and transported to jail, she never told Officer Bender that Mr. Green physically attacked or assaulted her in any way, though she stated that he attacked her.  Hernandez Depo. at 139-42, 150-51.  Deputy Hallman was not present at the time Plaintiff was handcuffed or arrested.  Hernandez Depo. 331; Plaintiff's Response to RFA No. 10. While Plaintiff was being driven to jail, she told Officer Bender that Mr. Green had parked around the corner from her house.  Bender Depo. at 150.

    Once the decision to arrest Plaintiff  was made, Officer Bender asked Deputy Hallman to give Mr. Green a ride away from the house.  Bender Depo. 160-161; Hallman Depo. at 109.  Deputy Hallman testified that it is customary to separate those involved in altercations while one is being taken out in handcuffs to avoid additional flare-ups, and he agreed to remove Mr. Green from the residence to avoid crossing paths with Ms. Hernandez.  Hallman Depo. 191.   Officer Bender spoke the word "teamwork" in the recording when Deputy Hallman was preparing to give Mr. Green a ride, but stated that Mr. Green was not on the "team."  Bender Depo 162. He considered Deputy Hallman and Officers Cole, Hibbs, and Fullmore to be on the team.  Bender Depo. at 162.  Deputy Hallman did not characterize the help he was giving to Mr. Green as teamwork.  Hallman Depo. at 162.  When Officer Bender spoke the word "teamwork," Deputy Hallman then stated, "you got kids?" and began singing, "What's gonna work?" TX 29 (and audio CD indicating that the words were sung, not spoken).  Because Deputy Hallman believed Mr. Green was intoxicated, he agreed to give him a ride.  Hallman Depo. 104-105, 109, 110-11.  Ultimately, Deputy Hallman offered to drive Mr. Green to a location outside of the Napa County line, while on overtime.  Hallman Depo. 194-195; see also TX 27-28.  Deputy Hallman equated his giving Mr. Green a ride to receiving a taxi ride, and joked that he would charge Mr. Green $50.00.  Hallman Depo. 195-196.  Deputy Hallman asked Mr. Green if he was being sneaky for having parked his car around the corner and Mr. Green responded, "kind of."  Hallman Depo196.  After observing the car and hearing this

1   response, Deputy Hallman did not think the wrong person had been arrested, and did not notify

2   Officer Bender that the wrong person had been arrested.  Hallman Depo. 196.

3          Two days later, on April 3, 2009, plaintiff contacted the Napa Police Department and asked

4   to speak to the officer who arrested her to give her side of the story.  Officer Bender came to her

5   house that evening to drop off forms for her to give another statement.  Hernandez Depo. at 165-66;

6   Fox Decl. Ex. E.  Plaintiff provided another handwritten statement in which she stated that the she

7   and Mr. Green had gotten into a physical altercation and Mr. Green physically restrained and injured

8   her.  Hernandez Depo. at 174-75,180-81, 184-85, 187-88, Ex. 6.  In that statement, she wrote "I am

9   sorry I did not let you know that Donald restrained me and hurt me."  Hernandez Depo. at 180, Ex.

10  6.  While Officer Bender was in Plaintiff's home on April 3, he advised her to obtain a restraining

11  order against Mr. Green and gave her a hand-out on domestic violence, and informed her that he

12  would be forwarding a supplemental report to the district attorney's office for review and

13  prosecution.  Fox Reply Decl. Ex. B; Supp. Fox Decl. Ex. 1.

14         According to Plaintiff's opposition, on April 8, 2009  she went to the Napa Police

15  Department to discuss her arrest.   See Pori Supplemental Decl. Ex. C (NAP000133-34)**.** An officer

16  named John Kostelac apparently spoke to Plaintiff and explained domestic violence laws and why

17  she was arrested.  Id.  In December 2009, he wrote an e-mail stating that he "would have been

18  required" to take a citizen's complaint "if she insisted, but she did not."  The e-mail further stated

19  that Plaintiff "insinuated that we were playing favorites by arresting her and not the boyfriend

20  because he is in Law Enforcement, but I cannot swear to that."  Id.

21         Also on April 8, 2008, plaintiff filed a handwritten statement in Napa Superior Court, under

22  penalty of perjury, in support of a temporary restraining order, stating, "I chose not to say too much.

23  I did say I had dialed 911, that the house was mine, that Donald had broken into my house and that

24  Donald did not live with me."  Hernandez Depo. at 193-194, 196-97, 200; Fox Decl. Ex. E.  She

25  stated that when speaking to the police "I did not describe the physical altercation."  Hernandez

26  Depo. at  200-202; Fox Decl. Ex. E.  In her written sworn statement, she did not claim that she told

27  the officers on the night of the incident that Mr. Green attacked her.  Hernandez Depo. at 201.

28  Plaintiff subsequently testified at the hearing on her application for a temporary restraining order

10

**United States District Court**
For the Northern District of California

1  against Mr. Green that she did not say much to the officers at the time of the incident, she did not

2  provide them complete information, and that when asked what had happened she answered

3  "nothing." Hernandez Depo. at 204-206, 208-209; Fox Decl. Ex F (transcript of TRO hearing) at 26.

4  Napa Police Department General Order 91-12 sets forth the City's policy and procedures for

5  handling domestic violence situations and Officer Bender believes that his conduct complied with

6  the requirements of the General Order.  Bender Depo. at 163-65, 169-72, Ex. 12. General Order 91-

7  12 states that, "when an officer responds to a domestic violence incident and the victim refuses

8  information and/or assistance, a report shall be written indicating such refusal."  Bender Depo. Ex.

9  12.  General Order 91-12 lists a number of California Penal Code Sections that should be considered

10  during the investigation of domestic violence incidents.  Bender Depo. at 173-74, Ex. 12.  Officer

11  Bender did not take into consideration Penal Code § 594 (vandalism), Penal Code § 602.5 (trespass),

12  or Penal Code § 603 (forcible entry and unauthorized destruction of property), which are on this list,

13  in his decision to arrest Plaintiff.  Bender Depo. at 174-75.

14  Prior to the April 1, 2009 incident, Plaintiff had previously called the police regarding Mr.

15  Green on two occasions. On both occasions, she called a non-emergency number to try to get the

16  police to call Mr. Green and ask him to leave.  Hernandez Depo. at 68-70.  On one occasion, while

17  speaking to dispatch, she asked the police not to come and did not return to her house.  Hernandez

18  Depo. at 70.  Approximately three months later, in January 2009, Plaintiff called a non-emergency

19  police number because she believed Mr. Green was trying to damage her house and the police

20  removed Mr. Green from her house and took him to a hotel.  Hernandez Depo. at 79.  She did not

21  seek a restraining order against Mr. Green either time.  Hernandez Depo. at 79.

22  During the April 1 incident, Officer Fullmore came by Plaintiff's house to drop off a camera

23  and made no mention of the fact that he had been at Plaintiff's house before.  Bender Depo. 168-

24  169.  Officer Fullmore had previously responded to a call to Plaintiff's house relating to an

25  altercation between her and Mr. Green.  Pori Decl. Ex. D (Fullmore Depo.) at 30.  During the prior

26  incident in January, Mr. Green was allegedly intoxicated and kicked down a door, and was taken to

27  a hotel for the night because Plaintiff wanted nothing done.  Fullmore Depo. at 33-34, 40.  During

28  the January incident, Officer Fullmore was aware that Mr. Green worked for Napa State Hospital

11

because it was broadcast to him en route.  Fullmore Depo. at 43.  He also testified that he ran a report for warrants, restraining order and prior histories en route so he would know what he was getting into and separated the parties upon arrival.  Fullmore Depo. at 31, 34-35.

During the April 2009 incident, Officer Bender made no inquiries as to whether anyone from the Napa Police Department had been at Plaintiff's residence before.  Bender Depo. at 169.  During the incident, Officer Bender photographed a broken door jam in Plaintiff's home, but did not ask Mr. Green any questions about the broken door jam and does not remember if he asked Plaintiff any. Bender Depo. at 175-76; Ex. 13.  Officer Bender prepared a report following the incident.  See Bender Depo. Ex. 15.  Officer Bender did not report that Mr. Green was reluctant to give answers and told the officers he was embarrassed, or that his written statement initially did not match his oral statement.  Bender Depo. at 72, 143, 172-73, Ex. 15.  Officer Bender did not report that Plaintiff crossed out the word "physical" from her written statement or that she told him that Mr. Green went into Plaintiff's bedroom and she wanted Mr. Green to leave or that he needed to leave immediately. Bender Depo. at 143, 147.  Officer Bender did not ask Deputy Hallman to write a supplemental report despite having spent time with Mr. Green.  Bender Depo. at 167-68.  Page four of the report is a domestic violence supplement, which includes questions to be answered regarding prior domestic violence incidents.  Bender Depo. at 190-91; Ex. 15-4.  Officer Bender did not fully complete this portion of the report because he did not investigate prior incidents of domestic violence.  Bender Depo. at 193-94.

Before the incident, Officer Bender received training in handling domestic violence situations while attending the police academy and at least every other year for the thirteen years before the incident.  Bender Depo. at 206.  Officer Bender considered Deputy Hallman a friend based on a working relationship of training together and working together on occasion.  Bender Depo. at 20.

Officer Bender did not hear discussion from any supervisory officials relating to lawsuits or claims made against the Napa Police Department during any pre-shift briefing.  Bender Depo. at 31-32, 34.  He was not advised of the number of citizen's complaints made against officers in the Napa Police Department or claims against public entities against the Napa Police Department during pre-

United States District Court
For the Northern District of California

1   shift briefing.  Bender Depo. at 33-34.  No one from the Napa Police Department interviewed

2   Officer Bender about Plaintiff's lawsuit outside the presence of counsel.  Bender Depo. at 93.

3         Plaintiff's "police practices" expert, Roger Clark, has submitted a sworn declaration opining,

4   among other things, that the defendants' conduct was unreasonable. According to Mr. Clark, Officer

5   Bender and Deputy Hallman "would be expected and required to know that Ms. Hernandez, at a

6   minimum, was the victim of domestic violence at the hands of Officer Green."  Clark Decl. at 5.

7   Mr. Clark opines that other likely crimes potentially committed by Green included burglary and

8   trespass.  Id.  Mr. Clark opines that the "obvious" motivation for the officers' acts was to protect Mr.

9   Green – a brother law enforcement officer who was at risk of discharge if accused of a crime.  Id.

10  Mr. Clark concludes that Ms. Hernandez' arrest would not have occurred had the officers followed

11  the legal and ethical professional requirements taught to all POST certified officers.  Id. Mr. Clark

12  also opines that the conspiracy to falsely arrest Ms. Hernandez and her false arrest were the result of

13  an informal policy or custom of ignoring claims against the City of Napa as well as lawsuits filed

14  against Napa Police Department.

15  **II.    LEGAL STANDARD**

16        Summary judgment shall be granted if "the pleadings, discovery and  disclosure materials on

17  file, and any affidavits show that there is no genuine issue as to any material fact and that the

18  movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts

19  are those which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S.

20  242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a

21  reasonable jury to return a verdict for the nonmoving party.  Id.  The court must view the facts in the

22  light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be

23  drawn from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

24  (1986).  The court must not weigh the evidence or determine the truth of the matter, but only

25  determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th

26  Cir. 1999).  The evidence presented by the parties must be admissible.  Fed. R. Civ. Proc. 56(e).

27        A party seeking summary judgment bears the initial burden of informing the court of the

28  basis for its motion, and of identifying those portions of the pleadings and discovery responses that

13

demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.

If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  Soremekun v. Thrifty Payless, Inc. 509 F.3d 978, 984 (9th Cir. 2007); see also Nelson v. Pima Community College, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment").  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

"In the context of qualified immunity, determinations that turn on questions of law, such as whether the officers had probable cause or reasonable suspicion to support their actions, are appropriately decided by the court.  However, a trial court should not grant summary judgment when there is a genuine dispute as to 'the facts and circumstances within an officer's knowledge' or 'what the officer and claimant did or failed to do.'"  Hopkins v. Bonvicino, 573 F.3d 752, 762 -763 (9th Cir. 2009) (internal citations omitted).

## III.    OBJECTIONS TO EVIDENCE AND MOTION TO STRIKE OBJECTIONS

The City Defendants have filed a 77-page document containing 160 "objections to evidence" along with their reply.  This document is in violation of Local Rule 7-3(c), which requires that "evidentiary and procedural objections to the opposition must be contained within the [15 page] reply brief or memorandum."  Local Rule 7-3(d) further provides that, "Once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval . . . ."  Because the local rules to do provide any mechanism or deadline for responding to evidentiary objections, the

United States District Court
For the Northern District of California

1   parties stipulated to allow Plaintiff until January 18, 2011 to file a response to the objections.  On

2   January 18, Plaintiff filed a Motion to Strike the objections for violation of the local rules, or in the

3   alternative that she be allowed to file a 75-page reply to the objections to evidence, and requested

4   that the Motion to Strike be heard on shortened time.  Plaintiff also filed a 61 page reply to the

5   objections.  The Court granted the request to hear the Motion to Strike on shortened time, and heard

6   the motion concurrently with the motion for summary judgment. .

7         Though the objections to evidence and Plaintiff's response are in violation of the local rules,

8   the Court will not strike them in their entirety on this basis and DENIES the motion to strike.  As

9   Defendants argue in their opposition to the motion, it would likely have been impossible for them to

10  comply with the rule and include all of their objections in a 15 page reply.  Defendants should have

11  requested leave to file an oversized brief or filed a separate motion to strike, and should have

12  exercised more restraint in filing such lengthy objections and are admonished to comply with the

13  Local Rules hereafter.

14        However, admissibility issues relating to some of Plaintiff's evidence must be considered in

15  connection with summary judgment, so entirely striking the objections would not help the Court.

16  However, as discussed below, many of Defendants' "objections" are not proper objections to

17  evidence and are overruled on that basis alone.  Defendants also make much of the fact that after

18  they filed objections, Plaintiff filed a supplemental declaration containing missing deposition pages

19  and documents.  However, the missing documents were submitted at the Court's request.

20        **A.      Objections to Pori Declaration and Attached Deposition Transcripts**

21        The City's "objections" to this deposition testimony are more accurately described as the

22  City's disagreement with how Plaintiff has characterized certain deposition testimony in her

23  Opposition (i.e., the "objection" is really directed toward the Opposition brief, not the underlying

24  deposition evidence).  These objections were not made during the depositions and thus were not

25  preserved, likely because much of the underlying testimony is unobjectionable on its face.

26  Objection Nos. 1-64 – made on the basis that certain deposition testimony attached to the Pori

27  Declaration "misstates evidence," is "speculative and assumes facts not in evidence" and/or is

28  "hearsay" – are OVERRULED.

**B.      Objections to Plaintiff's Request for Judicial Notice**

The City objects to Plaintiff's Request for Judicial Notice ("RJN") generally on grounds that Plaintiff did not supply the Court with the necessary information by which it can take judicial notice because the request did not attach the documents in question.  The City claims that it was prejudiced because it was forced to perform an investigation to determine what documents Plaintiff sought to have noticed.  However, the request did identify the Electronic Case Filing system docket numbers of the documents sought to be noticed, making it relatively easy to locate documents in question.  While Plaintiff's counsel should have attached the documents and submitted chambers copies of his voluminous submission, the Court will not refuse to consider the documents on this basis.  Objection No. 65 is OVERRULED.

Objection No. 66 argues that RJN Ex. 1 is not a proper subject of judicial notice.  Defendants contend that this is a transcript of an audio recording , and it is not capable of accurate and ready determination and its accuracy can be questioned.  At oral argument, Defendants specified that they are only challenging the accuracy of one line of the transcript (page 6:8 "He had a knife").  Generally speaking, judicial notice is not the proper vehicle for the Court's consideration of this document.  At oral argument, Plaintiff cited <u>Martinez v. Stanford</u>, 323 F3d. 1178, 1184 (9th Cir. 2003) in support of his contention that judicial notice is appropriate.  However, there is no mention of judicial notice or a challenge to the accuracy of a transcription in <u>Martinez</u>.  Given that the accuracy of a portion of the transcript is questioned, the Court cannot take judicial notice of that portion.  However, <u>Martinez</u> did hold that the plaintiff's deposition testimony, submitted by defendants in connection with an earlier motion and referred to in their moving papers in a renewed motion but not re-submitted with the new motion, created a triable issue of fact to defeat defendants' own summary judgment motion.  Here, the Court relied on the transcript of the audio recording in connection with a prior motion after listening to the audio recording, at which time neither side challenged its accuracy.  Therefore, the Court will consider the remainder of the transcript as evidence already in the record.  Additionally, RJN Exhibit 2, the subject of Objection No. 67, is a declaration by the individual who prepared the transcript, Greg Stuchman, attesting to its accuracy, as well as his credentials and portions of the transcript.  Judicial Notice is also not the proper vehicle

United States District Court
For the Northern District of California

for admitting this evidence, but because the declaration is also already in the record, this is at most a technical error.  Objection Nos. 66 and 67 are OVERRULED, except as to the disputed phrase "He had a knife."

Objection Nos. 68-71 are similar to the objections to deposition testimony discussed above in that the objections are actually directed at Plaintiff's characterization of the transcript in her Opposition, not at the transcript itself.  These are not proper objections to evidence and are OVERRULED.

C.      Exhibit 20 NAP 000133-34

This exhibit (an internal email exchange between officers discussing an encounter between one of the officers and Plaintiff when she came into the station to discuss her arrest a week later) was referenced in Plaintiff's Opposition and attached to the Pori Supplemental Declaration.  Defendants contend that the document is double-hearsay.  However, Plaintiff argues that it is not proffered for its truth, but to show that Plaintiff came and tried to explain that her boyfriend was given preferential treatment because he was in law enforcement, and the officer failed to provide her with a written description of an officer complaint procedure as required by Penal Code § 832.5(a)(1) ("Each department or agency in this state that employs peace officers shall establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies, and shall make a written description of the procedure available to the public.").  She contends that this falls within the "state of mind" hearsay exception of Federal Rule of Evidence 803(3).  However, this exception is for "then existing" states of mind, and excludes "statements of memory or belief to prove the fact remembered or believed," so excludes her statement of belief about the circumstances of her arrest seven days earlier.  However, to the extent it is not offered for the truth of what she said, but for the impact of her saying it on the officer who heard it, it is not hearsay.

More persuasively, Plaintiff claims that it is a non-hearsay admission by a party opponent under Rule 801(d)(2), and the Court agrees that the contents of the email indicate that it is a "statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  See Fed. R. Evid. 801(d)(2)(D).

17

1    Plaintiff claims that the email is relevant to her <u>Monell</u> claim to show that the Napa Police were

2    indifferent to her complaint following her arrest.  However, her claims are not directed to a failure to

3    adequately handle her post-arrest complaint, but instead the circumstances of the false arrest itself.

4    Therefore, though admissible, as discussed below it is unclear how this document supports

5    Plaintiff's <u>Monell</u> claim.   Objection No. 72 is OVERRULED.

6          **D.       Declaration of Plaintiff's Expert Roger Clark**

7          Ms. Hernandez's Opposition relies in part on the declaration of her proposed Police Practices

8    Expert, Roger Clark.  Mr. Clark is a 27-year veteran of the Los Angeles County Sheriff's

9    Department whose qualifications are detailed in his declaration.  <u>See</u> Clark Decl. ¶¶ 119-59.  In

10   Objection to Evidence Nos. 73-160, the City Defendants challenge the relevance and admissibility

11   of this declaration and various portions of it, as well as the exhibits attached thereto.  The Court did

12   not rely on this declaration with respect to Plaintiff's probable cause and conspiracy claims because

13   much of it is speculative, unreliable, and not the proper subject of an expert opinion for the reasons

14   stated by Defendants, and Plaintiff presented other admissible evidence to create a triable issue of

15   fact.  To the extent that the Court considered the evidence attached to the Clark declaration in

16   evaluating Plaintiff's <u>Monell</u> claim, even when considered that evidence is unhelpful to Plaintiff for

17   the reasons stated below.       Defendants' Objection Nos. 73-160 are SUSTAINED, except to the

18   extent that certain select portions of the declaration and evidence attached thereto are addressed in

19   connection with Plaintiff's Monell claim, in which case those objections are OVERRULED.

20   **IV.    ANALYSIS**

21          **1.       Is There A Triable Issue Of Fact As To Whether Plaintiff's Civil Rights
                     Were Violated?[2]**

22

23          **A.       Probable Cause**

24          The City Defendants[3] first argue that Plaintiff's § 1983 claim for false arrest fails because

25          [2] Plaintiff has agreed to dismiss her § 1983 claim for excessive force and corresponding assault
26   and battery tort claims, so her claims are now focused on the alleged false arrest, conspiracy and related
     claims.

27          [3] Plaintiff's first claim for violation of 42 U.S.C. § 1983 was brought against all defendants,
28   including the City of Napa, Chief Melton, and Officer Bender.  However, there is no allegation or
     argument that Chief Melton was involved in the incident in a personal capacity so there can be no direct

**United States District Court**
For the Northern District of California

18

**United States District Court**
For the Northern District of California

there is no triable issue of material fact as to probable cause and no reasonable juror could find other than that Officer Bender had probable cause to arrest Plaintiff. While a very close question, and one on which a jury may very well side with Officer Bender at trial, drawing all inferences in Plaintiff's favor as it must, the Court cannot determine as a matter of law that *no* reasonable juror could find that Officer Bender acted unreasonably in deeming Plaintiff to be the dominant aggressor and finding probable cause to arrest her under the circumstances known to him at the time of her arrest.

The relevant question of probable cause is whether "at the moment the arrest was made," the facts and circumstances within the officers' knowledge and of which he had reasonably trustworthy information were sufficient to warrant a prudent man in believing the suspect had violated the law." Grant v. City of Long Beach, 315 F.3d 1081, 1089 (9th Cir. 2002); see also Beier v. City of Lewison, 354 F.2d 1058, 1065 (9th Cir. 2004) (probable cause exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability the [the plaintiff] had committed a crime."). "Probable cause must be determined at the time the arrest is made[;] facts learned or evidence obtained [after] a stop or arrest cannot be used to support probable cause unless they were known to the officer at the moment the arrest was made." Allen v. City of Portland, 73 F.3d 232, 236 (9th Cir.1996) (citing Wong Sun v. United States, 371 U.S. 471, 482 (1963)).

"Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. . . . Rather, the court will evaluate generally the circumstances at the time of the arrest to decide if the officer had probable cause for his action: 'In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Adams v. Williams, 407 U.S. 143, 148 (1972). If a defendant had probable cause to make an arrest, then the plaintiff's arrest is lawful regardless of the officer's subjective motivation. Tatum v. City & County of S.F., 441 F.3d 1090,

---

§ 1983 claim against him. See Motion at n.2. There is also no respondeat superior liability for the City under § 1983. Plaintiff's Monell claims against the City or the Chief, asserted in Claim 2 of Plaintiff's SAC, are addressed separately below. At oral argument, Plaintiff confirmed that she is not pursuing any non-Monell claim against the Chief or the City so the first claim is dismissed as to them.

United States District Court
For the Northern District of California

1   1094 (9th Cir.2006).  Additionally, once probable cause is established, an officer is under no duty to

2   further investigate or look for additional evidence which may exculpate the accused.  See Broam v.

3   Bogan, 320 F.3d 1023, 1032 (9th Cir. 2003).  "The Constitution does not guarantee that only the

4   guilty will be arrested. If it did, section 1983 would provide a cause of action for every defendant

5   acquitted— indeed for every suspect released."  Baker, 443 U.S. at 145.

6   　　　　Because Plaintiff was ultimately arrested for domestic violence, whether Officer Bender had

7   probable cause to arrest her turns in part on California's applicable domestic violence statutes.

8   California Penal Code § 242 provides that:  "A battery is a willful and unlawful use of force or

9   violence upon the person of another."  California Penal Code § 243, specific to domestic violence,

10  states: "When a battery is committed against a . . . person with whom the defendant currently has, or

11  has previously had, a dating . . . relationship, the battery is punishable by a fine not exceeding two

12  thousand dollars ($2,000), or by imprisonment in a county jail for a period of not more than one

13  year, or by both that fine and imprisonment. . . . (f) As used in this section: . . . (5) "Injury" means

14  any physical injury which requires professional medical treatment. . . . (10) "Dating relationship"

15  means frequent, intimate associations primarily  characterized by the expectation of affectional or

16  sexual involvement independent of financial consideration."  The "injury" requirement of this

17  provision does not mean that the victim must actually receive medical treatment, but instead the

18  nature, extent, and seriousness of the injury is determinative.  People v. Longoria, 32 Cal.App.4th 12,

19  17 (1996).

20  　　　　Penal Code § 836 further provides that: "(d) . . . if a suspect commits an assault or battery

21  upon a current or former cohabitant . . . [or] a person with whom the suspect currently is having or

22  has previously had an engagement or dating relationship as defined in paragraph (10) of subdivision

23  (f) of Section 243, . . . a peace officer may arrest the suspect without a warrant where both of the

24  following circumstances apply: (1) The peace officer has probable cause to believe that the person to

25  be arrested has committed the assault or battery, whether or not it has in fact been committed. (2)

26  The peace officer makes the arrest as soon as probable cause arises to believe that the person to be

27  arrested has committed the assault or battery, whether or not it has in fact been committed."

28  　　　　Penal Code § 273.5 also requires that: "(a) Any person who willfully inflicts upon a person

20

**United States District Court**
For the Northern District of California

who is his or her spouse, former spouse . . . corporal injury resulting in a traumatic condition, is guilty of a felony . . . (b) As used in this section, "traumatic condition" means a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force." "Section 273.5 is violated when the defendant inflicts even 'minor' injury.  Unlike other felonies, e.g., aggravated battery . . . which require serious or great bodily injury, 'the Legislature has clothed persons of the opposite sex in intimate relationships with greater protection by requiring less harm to be inflicted before the offense is committed.'"  <u>People v. Wilkins</u>, 14 Cal. App. 4th 761, 771 (1993).  "The statute prohibits an assault by means of force likely to produce great bodily injury, not the use of force which does in fact produce such injury. . . . Further, the use of hands or fists alone may be sufficient to establish a violation."  <u>Id</u>. at 1166, fn. 7.  "[A]n officer given the alternative of arresting for a felony under the provisions of section 273[.5] may do so when he observes traumatic injury."  <u>People v. Gutierrez</u>, 171 Cal. App. 3d 944, 950 (1985).  Traumatic injury for purposes of § 273.5 has been defined as "a wound or other abnormal bodily condition resulting from the application of some external force, [and] an abnormal condition of the living body produced by violence . . . [and also as] 'an injury or wound to a living body caused by the application of external force or violence . . .' It is inherent in the definition that both serious and minor injury is embraced – traumata of all kinds.'"  <u>Gutierrez</u>, 171 Cal. App. 3d at 952.

Importantly for purposes of this motion, Penal Code §13701 further requires that "Peace officers shall make reasonable efforts  to identify the dominant aggressor in any incident.  The dominant aggressor is the person determined to be the most significant, rather than the first aggressor."  Penal Code § 13071(c) further provides that: "In identifying the dominant aggressor, an officer shall consider the intent of the law to protect victims of domestic violence from continuing abuse, . . . the history of domestic violence between the persons involved, and whether either person acted in self-defense."  Napa Police Department General Order 91-12 requires that misdemeanor arrests "shall be made when there is reasonable cause to believe that a misdemeanor has been committed" and discourages the release of domestic violence suspects on citation.

The City Defendants argue that the undisputed evidence shows that Officer Bender's arrest of Plaintiff for domestic violence against Mr. Green was supported by probable cause.  Specifically,

they contend that Officer Bender heard fighting as he approached the house and then observed Mr. Green bleeding with scratches on his chest. During the investigation, Mr. Green told him that he and Plaintiff had been in an on-and-off relationship during which they previously lived together and that they had gotten into an argument about their relationship. He eventually told Officer Bender that plaintiff had pushed and shoved him, scratching his chest and arm, and denied striking or physically assaulting Plaintiff. Mr. Green made a written statement on the night of the incident that Plaintiff yelled and pushed him and attacked him. Plaintiff admits that she punched Mr. Green in the chest with as much force as she could on the night of the incident.

Defendants also contend that Officer Bender did not see any visible injuries on Plaintiff's wrists or in her mouth after examination (though Deputy Hallman said he saw her spit pink into the sink and stated in the presence of Officer Bender "she's got marks on her too"), and Plaintiff herself was unaware of any injuries and said she was fine when questioned about any injuries. When directly questioned by Officer Bender, Plaintiff stated that "nothing happened." Plaintiff admittedly never told Officer Bender that Mr. Green "physically attacked" her, though there is evidence that she told him several times that Mr. Green "attacked" her.[4] She asked Officer Bender whether Mr. Green told him that *she* hit *him*, but did not ever state that *he* hit *her*. Plaintiff prepared a written statement on the night of the incident that there was a "verbal altercation." Plaintiff initially wrote the word "physical" before altercation and then scratched it out and replaced it with "verbal" before Officer Bender saw what she had written. When she told Officer Bender several days later that Mr. Green had physically assaulted her during the incident, Officer Bender gave her a domestic violence pamphlet, recommended that she get a restraining order, and forwarded a supplemental report with her revised statement to the district attorney's office for prosecution.

---

[4] The City Defendants attempt to downplay Plaintiff's after-the-fact deposition testimony that she told Officer Bender that Mr. Green attacked her on the night of the incident, in light of her statement three days later apologizing for not telling him that Mr. Green "restrained and hurt" her and her failure to mention any physical attack in connection with her application and hearing for a TRO. However, this Court has previously held that the deposition testimony is not necessarily contradictory and any contradiction has been sufficiently explained so the later deposition testimony will not be disregarded as a sham for purposes of summary judgment. Further, the Court may not make a credibility determination about this testimony at this stage in the proceeding, though the trier of fact may determine that the testimony is not credible when viewed in connection with other of Plaintiff's statements.

United States District Court
For the Northern District of California

Plaintiff counters that, despite these facts, there is a triable issue as to probable cause because Officer Bender ignored overwhelming exculpatory evidence that negated probable cause and would have caused a reasonable officer to investigate further and arrest Mr. Green as the dominant aggressor instead.  For this position, Plaintiff relies in part on more clear-cut cases from other circuits where there was a complete absence of investigation.  For example, in BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986), the Seventh Circuit held that a police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest, and therefore an officer arresting parents for child neglect without any evidence of intent (an element of the crime), who failed to question several individuals present at the scene to obtain information about the parents' intent, acted unreasonably.  Similarly, in Kingsland v. City of Miami, 369 F.3d 1210, 1216 (11th Cir. 2004), withdrawn by Kingsland v. City of Miami, 382 F.3d 1220 (11th Cir. 2004)), the plaintiff was arrested for driving under the influence after a collision with an off-duty police officer even though none of the approximately twenty police officers on the scene took plaintiff's statement or questioned any witness at the scene other than the off-duty officer.  Plaintiff also relies on Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001) (citing Fuller v. M.G. Jewelry, 950 F.2d 1437, 1444 (9th Cir. 1991)) for the position that "[i]n establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was a victim of a crime, but must independently investigate the basis of the witness' knowledge or interview other witnesses." In Arpin, decided on a motion to dismiss, the complaint alleged that the arresting officer refused to identify himself, would not inform the plaintiff of the reason she was being arrested, and did not allow the plaintiff to explain her side of the story prior to arresting her.  Id.  The Ninth Circuit held that the allegations of the complaint raised an inference that the officers arrested the plaintiff based on an accusers's unexamined charge, and if they did not independently investigate his battery claim, they did not have probable cause to arrest the plaintiff.  Id.   These cases involve a complete failure to investigate, whereas here it is undisputed that Officer Bender did question both Plaintiff and Mr. Green at the scene.

However, while a closer question than the cases on which Plaintiff relies, viewed in the light most favorable to Plaintiff and without making any credibility determination, the evidence raises a

triable issue of fact as to whether there was probable cause to arrest her as the dominant aggressor.
Officer Bender knew at some point that a female made the initial 911 call demanding that someone
""get the f*&# out of [her] house" and  heard Mr. Green accusing Plaintiff of memorizing another
man's phone number as he approached. Mr. Green appeared intoxicated and was in his underwear,
Plaintiff told Deputy Hallman that Mr. Green had entered her bedroom and she owned the house and
she wanted him to leave, and he learned that Mr. Green's only belongings in the house was his
uniform.  While in her home, Officer Bender took a photograph of a broken door jam but did not
question Mr. Green about it and does not recall questioning Plaintiff about it.  Despite all of this,
Officer Bender did not consider whether Mr. Green was a trespasser, whether Plaintiff had exercised
her right to evict a trespasser, or whether she had acted in self-defense as required by the Penal
Code.[5]  While Defendants argue that it was reasonable for Officer Bender to conclude that Mr.
Green entered Plaintiff's house with permission before the fight started, a reasonable juror could
also conclude that he did not make a reasonable effort to determine who was the dominant
aggressor, especially in failing to consider self-defense or trespass.

Additionally, despite the fact that Officer Bender did not see any injury to Plaintiff, Deputy
Hallman said in Officer Bender's presence, "No, it got physical. She's got marks on her too" and
told him that she spit something pink into the sink.  Plaintiff testified that she told Officer Bender
several times that Mr. Green attacked her (though she did not specifically say it was physical attack,
these statements are not reflected in the transcript of the audio recording, and other of Plaintiff's
testimony and sworn statements are to the contrary).  Mr. Green initially told Officer Bender that the
fight did not get physical, but then said she hit him after discussion with the officers which Plaintiff
contends indicates coaching.  Officer Bender did not question Plaintiff about why she scratched out

---

[5] Plaintiff also relies heavily on the fact that Officer Bender did not run any warrant or prior incident reports prior to Plaintiff's arrest.  Defendants contend that this is immaterial because when Plaintiff called the police on two prior occasions relating to Mr. Green, both times she called a non-emergency number, on one occasion she asked the police not to come, and at no time did she seek a TRO, so no information would have been revealed even if the reports had been run.  However, during oral argument, neither party could definitively say whether information about prior police visits to Plaintiff's house would have been disclosed if Officer Bender had run a prior incident report.  Officer Fullmore testified that when he was previously called to Plaintiff's house, he did run such reports on the way to find out what he was getting into.  Therefore, Officer Bender's failure to run reports is also somewhat helpful to Plaintiff.

United States District Court
For the Northern District of California

1    the word "physical" on her statement, though the word it is somewhat legible through the scratch

2    marks.

3    Viewing all of the evidence together, while the question is a close one, a reasonable juror

4    *might* be able to conclude that Officer Bender lacked probable cause to determine that Plaintiff was

5    the dominant aggressor and arrest her in her own home without considering whether she acted in

6    self-defense and/or was exercising her right to eject a trespasser, who was inebriated, largely

7    undressed in his underwear, and who made inconsistent and evasive statements about what

8    happened.

9    **B.      Conspiracy to Commit False Arrest**

10    The City Defendants argue without analysis or citation that "there is no evidence that

11    Officer Bender shared a common objective with Deputy Hallman and Green to wrongfully arrest

12    plaintiff," so the conspiracy claim should be dismissed as a matter of law.   Motion at 14.   Plaintiff

13    counters that there is sufficient evidence to support this claim.

14    "To establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the

15    existence of an agreement or meeting of the minds' to violate constitutional rights.   Mendocino

16    Envt'l. Ctr. v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotation marks

17    omitted). 'Such an agreement need not be overt, and may be inferred on the basis of circumstantial

18    evidence such as the actions of the defendants.' Id.   'To be liable, each participant in the conspiracy

19    need not know the exact details of the plan, but each participant must at least share the common

20    objective of the conspiracy.'"   Crowe v. County of San Diego, 608 F.3d 406, 440 (9th Cir. 2010)

21    (internal citations omitted).   "Whether defendants were involved in an unlawful conspiracy is

22    generally a factual issue and should be resolved by the jury, 'so long as there is a possibility that the

23    jury can 'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds'

24    and thus reached a understanding' to achieve the conspiracy's objectives."   Mendocino

25    Environmental Center v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999).   However, a

26    conspiracy, even if established, "does not give rise to liability under § 1983 unless there is an actual

27    deprivation of civil rights" resulting from the conspiracy.   Woodrum v. Woodward County, OK, 866

28

United States District Court
For the Northern District of California

1    F.2d 1121, 1126 (9th Cir. 1989).

2         Examined in the light most favorable to Plaintiff, evidence of Officer Bender and Deputy

3    Hallman's interactions with Mr. Green could be interpreted as showing some favoritism or

4    agreement via teamwork to help Mr. Green at Plaintiff's expense, which could persuade a

5    reasonable juror to conclude that there was a conspiracy to arrest Plaintiff instead of Mr. Green even

6    though Mr. Green was the dominant aggressor.  Specifically, Officer Bender considered Deputy

7    Hallman to be a "friend" based on prior work together; Deputy Hallman referred to Mr. Green as

8    "brother" and gave what could be characterized as advice to Mr. Green; Deputy Hallman can be

9    heard making strange noises into the recording, thereby blocking out others' voices; both he and

10   Officer Bender knew Mr. Green was a Napa State Hospital officer; neither officer checked for prior

11   calls related to domestic violence at the house; and Deputy Hallman and Officer Bender both used

12   the word "team" and Deputy Hallman began singing about "teamwork" after the decision to arrest

13   Plaintiff was made.  Further, there was a clear agreement among Bender, Hallman and Green that

14   Deputy Hallman drive Mr. Green away from Plaintiff's house after she was arrested, and arguably

15   this is circumstantial evidence of a conspiracy.  Additionally, the fact that Officer Fullmore had been

16   to Plaintiff's house previously at her request for police assistance, and drove an intoxicated Mr.

17   Green and his son to a hotel, but apparently failed to mention this when he dropped off a camera

18   during the incident, lends some minor support to this conclusion.

19        It would require some weighing of the evidence to make a determination about the import of

20   the use of the terms "brother" and "teamwork," and the other circumstantial evidence might support

21   an inference of conspiracy.  See Mendocino Environmental Center, 192 F.3d at 1301.  The fact that

22   Officer Bender later requested that the district attorney prosecute Mr. Green for domestic violence

23   based on Plaintiff's revised statement (see Fox Reply Ex. B; Supp. Fox Decl. Ex. 1) is not sufficient

24   to take the claim of conspiracy away from the jury because it occurred several days later, although it

25   may well prove powerful evidence for the defense at trial.   The issue of conspiracy "is generally a

26   factual issue and should be resolved by the jury, 'so long as there is a possibility that the jury can

27   'infer from the circumstances (that the alleged conspirators) had a 'meeting of the minds' and thus

28   reached a understanding' to achieve the conspiracy's objectives." Mendocino Environmental Center

**United States District Court**
For the Northern District of California

1  v. Mendocino County, 192 F.3d 1283, 1301 (9th Cir. 1999).  For the reasons discussed above, based

2  on the evidence viewed in the light most favorable to Plaintiff, this possibility exists and therefore

3  summary judgment of the conspiracy claim is also DENIED.

4            **C.**      **The Doctrine of Qualified Immunity**

5          The City Defendants also argue that Officer Bender's actions are protected by the doctrine of

6  qualified immunity.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1962) (qualified immunity

7  protects government officials "from liability for civil damages insofar as their conduct does not

8  violate clearly established statutory or constitutional rights of which a reasonable person would have

9  known.").  The standard for qualified immunity is the "'objective legal reasonableness' of the action,

10  assessed in light of the legal rules that were 'clearly established' at the time it was taken." Anderson

11  v. Creighton, 483 U.S. 635, 638 (1987) (citing Harlow v. Fitzgerald, 457 U.S. 800 (1982)).

12  "Therefore, regardless of whether the constitutional violation occurred, the [official] should prevail

13  if the right asserted by the plaintiff was not 'clearly established' or the [official] could have

14  reasonably believed that his particular conduct was lawful." Romero v. Kitsap County, 931 F. 2d

15  624, 627 (9th Cir. 1991).  Judges may exercise discretion as to which of the two prongs to address

16  first.  Pearson v. Callahan, 129 S. Ct. 808 (2009).  If Defendants had a reasonable but mistaken

17  belief that their conduct was lawful, qualified immunity applies.  Saucier, 533 U.S. at 205-6.  The

18  doctrine "provides ample protection to all but the plainly incompetent or those who knowingly

19  violate the law." Burns v. Reed, 500 U.S. 478, 495 (1991); see also Rodis v. City and County of San

20  Francisco, 558 F.3d 964, 970-71 (9th Cir. 2009) (officer entitled to qualified immunity where

21  plaintiff was arrested for counterfeiting but the bills were actually authentic, because evidence did

22  not establish that the officer was plainly incompetent).

23          First, the City Defendants argue that even if Plaintiff's arrest was not supported by probable

24  cause, which they dispute, Plaintiff cannot meet her burden of creating a triable issue that Officer

25  Bender could not have reasonably believed that his conduct in arresting Plaintiff as the dominant

26  aggressor under the circumstances was lawful.  They contend that he reasonably relied on his

27  observations of Plaintiff and Mr. Green as well as their respective statements and physical

28  conditions to determine that Plaintiff was the dominant aggressor and arrest her, as required by the

Penal Code § 13071 ("written policies shall encourage the arrest of domestic violence offenders if there is probable cause that an offense has been committed . . . . Peace officers shall make reasonable efforts to identify the dominant aggressor in any incident.  The dominant aggressor is the person determined to be the most significant, rather than the first, aggressor") and Napa Police Department General Order 91-12 (requiring that misdemeanor arrests "shall be made when there is reasonable cause to believe that a misdemeanor has been committed" and discouraging the release of domestic violence suspects on citation).  According to the City Defendants, there is no evidence that he was prohibited from arresting her under the totality of the circumstances known to him at the time, and a reasonable officer could have believed that her arrest was warranted.

Plaintiff counters that it is clearly established that Plaintiff has a right to be free from false arrest and conspiracy to commit false arrest – a proposition Defendants do not dispute.  She cites several out-of-circuit cases holding that reasonable officers would know that actions such as framing innocent people and reliance on deliberate falsehoods cannot support probable cause.  See Opp. at 19.  Unlike the cases cited by Plaintiff, however, here there is no evidence of knowing reliance on false testimony or deliberate framing, and it is undisputed that Officer Bender interviewed both witnesses and undertook an investigation of the incident.  Therefore, these cases alone do not clearly establish a triable issue of fact on qualified immunity.

Plaintiff also argues that an officer is not entitled to qualified immunity where exculpatory evidence is ignored that would negate a finding of probable cause.  For this position, Plaintiff relies on Broam v. Bogan, 320 F.3d 1023, 1031 (9th Cir. 2003), in which the lower court granted a motion to dismiss with prejudice in a case involving the propriety of an officer's investigation of a child's sexual abuse allegations.  The Ninth Circuit reversed, finding that the plaintiff might be able to amend the complaint to include the dates of the alleged events, which would in turn determine whether the claims were viable based on a failure to consider exculpatory evidence or were barred by qualified immunity.  Broam did not reach the issue of whether the exculpatory evidence at issue made the plaintiff's arrest objectively unreasonable, and does not show that under clearly established law, Officer Bender would have known that his actions were unreasonable or would be unlawful.

More persuasively, however, Plaintiff points to the requirement of Penal Code § 13071(c)

28

that: "In identifying the dominant aggressor, an officer *shall* consider the intent of the law to protect victims of domestic violence from continuing abuse, . . . the history of domestic violence between the persons involved, and whether either person acted in self-defense" (emphasis added). Additionally, General Order 91-12 lists a number of California Penal Code Sections that should be considered during the investigation of domestic violence incidents, including those prohibiting trespass and forcible entry.  Officer Bender admittedly did not consider whether Mr. Green was a trespasser, did not ask Plaintiff whether she was acting in self-defense and did not investigate any history of domestic violence between the parties, despite the fact that circumstantial evidence known to Officer Bender prior to the arrest should have alerted him to these possibilities.

The Court is mindful that the task of determining the dominant aggressor in a domestic violence incident in which the victim is not forthcoming but seeks to protect the main aggressor is not an easy one, and jurors who, unlike the Court, may make credibility determinations, may well decide that Officer Bender acted reasonably, or at most negligently (and with good intention rather than to favor Mr. Green).  However, under clearly established law admittedly known to him at the time, Officer Bender was required to consider Plaintiff's right to eject a trespasser and act in self-defense in determining who was the dominant aggressor, and a reasonable juror could find that he could not reasonably have believed that he should arrest Plaintiff as the dominant aggressor while he knew he had failed to consider these factors.

Because qualified immunity does not apply, the Motion is DENIED as to the § 1983 claims against Officer Bender.

**2.      The City And Chief Melton's <u>Monell</u> Liability**

The City Defendants first contend that there can be no <u>Monell</u> liability where there has been no underlying constitutional violation by a municipal employee.  <u>See City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986).  However, there is a triable issue of fact as to whether there was probable cause for Officer Bender to arrest Plaintiff.

The City Defendants also move for summary judgment of Plaintiff's § 1983 <u>Monell</u> claim

United States District Court
For the Northern District of California

1   against the City and Chief Melton in his official capacity[6] on grounds that the complaint does not

2   allege any injury caused by an official policy, pattern or practice, as required by Monell v. Dept. of

3   Social Services, 436 U.S. 658, 691 (1978).  A city or county may not be held vicariously liable for

4   the unconstitutional acts of its employees under the theory of respondeat superior.  Board of the

5   County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 403 (1997); Monell, 436

6   U.S. at 691.  Instead, "it is when execution of a government's policy or custom, whether made by its

7   lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the

8   injuries that the government as an entity is responsible under § 1983."  Monell, 436 U.S. at 694.

9   Alternatively, liability may be based on a policy, practice or custom of omission amounting to

10  deliberate indifference."  See Gibson v. City of Washoe, Nevada, 290 F.3d 1175 (9th Cir. 2002).

11      There are three ways to show an affirmative policy or practice of a municipality:  (1) by

12  showing "a longstanding practice or custom which constitutes the "standard operating procedure" of

13  the local government entity;" (2) "by showing that the decision-making official was, as a matter of

14  state law, a final policymaking authority whose edicts or acts may fairly be said to represent official

15  policy in the area of decision;" or (3) "by showing that an official with final policymaking authority

16  either delegated that authority to, or ratified the decision of, a subordinate."  Menotti v. City of

17  Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting Ulrich v. City and County of San Francisco,

18  308 F.3d 968, 984 (9th Cir. 2002)).  After proving that one of the three circumstances existed, a

19  plaintiff must also show that the circumstance was both the cause in fact and the proximate cause of

20  the constitutional deprivation.  Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996).

21      Proof of random acts or isolated incidents of unconstitutional action by a non-policymaking

22  employee are insufficient to establish the existence of a municipal policy or custom.  See McDade v.

23

24      [6] Where both the public entity and a municipal officer are named in a lawsuit, a court may
    dismiss the individual named in his official capacity as a redundant defendant.  See Center for Bio-

25  Ethical Reform, Inc. v. Los Angeles County Sheriff's Department, 533 F.3d 780, 799 (9th Cir. 1986)
    ("An official capacity suit against a municipal officer is equivalent to a suit against the entity. Kentucky

26  v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). When both a municipal
    officer and a local government entity are named, and the officer is named only in an official capacity,

27  the court may dismiss the officer as a redundant defendant.").  Plaintiff has not shown that the § 1983
    claims against Chief Melton in his official capacity are not redundant, so summary judgment is

28  GRANTED as to him.

United States District Court
For the Northern District of California

1    West, 223 F.3d 1135, 1141 (9th Cir. 2000); Davis v. City of Ellenburg, 869 F.2d 1230, 1233 (9th

2    Cir. 1989 ); Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may

3    not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient

4    duration, frequency and consistency that the conduct has become a traditional method of carrying

5    out policy;" but noting that liability based on ratification or delegation can be based on a single

6    incident). "When one must resort to inference, conjecture and speculation to explain events, the

7    challenged practice is not of sufficient duration, frequency and consistency to constitute an

8    actionable policy or custom." Trevino v. Gates, 99 F.3d 911, 920 (9th Cir. 1996).

9          To establish a policy of omission, Plaintiffs must show that "the municipality's deliberate

10   indifference led to its omission and that the omission caused the employee to commit the

11   constitutional violation." Gibson, 290 F.3d at 1186. Plaintiffs can establish deliberate indifference

12   only by showing that "the municipality was on actual or constructive notice that its omissions would

13   likely result in a constitutional violation." Id.

14         In the SAC, Plaintiff's Monell claim appears based on both affirmative acts and omissions.

15   See SAC ¶¶ 27-29. Her SAC alleges a habit, custom, policy or practice of failure to protect citizens

16   from "persistent assaultive conduct of off-duty police officers," sanctioning of false arrests,

17   protection of off-duty police officers after they have committed crimes against citizens, and failure

18   to take measures to prevent these violations. Id. Her opposition to the motion for summary

19   judgment specified that her focus is on a policy of preferential treatment of off-duty officers that

20   resulted in her false arrest, or a failure to reprimand officers or respond to citizen complaints of false

21   arrest which led to a feeling of impunity for false arrests which ultimately led to her arrest. See Opp.

22   at 21-22. At oral argument, the Court questioned Plaintiff about the precise theory of her Monell

23   claim, and Plaintiff shifted her theory and stated that it is based on "several instances" where the

24   City of Napa "has been placed on notice of claims against public entities and complaints against

25   police officers that are not investigated" and "deliberately ignore" the claims. Hearing Transcript at

26   40, 50. The Court finds that there is insufficient evidence of a policy, pattern or practice to support

27   any of Plaintiff's theories of Monell liability.

28         The City Defendants correctly contend that Plaintiff has no evidence of an unconstitutional

United States District Court
For the Northern District of California

policy or practice of preferential treatment of off-duty officers that caused her allegedly false arrest. Plaintiff's opposition does not specifically point to *any* evidence where off-duty officers were protected at the expense of private citizens. The declaration of Roger Clark, Plaintiff's police practices expert, does address this issue. See Clark Decl. ¶¶ 108-118. He opines that "the conspiracy to falsely arrest Ms. Hernandez and her [sic] false arrest of Ms. Hernandez was the direct result of the Napa Police Department's informal policy or custom of ignoring claims against the City of Napa as well as lawsuits filed against Napa P.D., in order to give preferential treatment to off duty police officers at the expense of private citizens." Clark Decl. ¶ 108. He bases this opinion on a review of various claims and civil complaints against the City of Napa, without having reviewed the complete claim files or determined the outcome of the complaints or whether they were substantiated. Id. Further, only one of these incidents relates to an off-duty officer**,** and during the course of the investigation the complainants in that case admitted that they intentionally attacked the off-duty officer's girlfriend so their arrest was justified. Id. at ¶ 108(a). He also mentions another incident involving an off-duty Napa County Sheriff's Department officer calling an African-American woman named Ms. Gomes a derogatory name and flashing his badge, but provides no evidentiary support for this incident and does not explain any adverse action taken against the complainant. Id. at ¶ 117. Further, Defendants have provided additional information regarding this incident showing that Ms. Gomes filed a complaint with Napa County Sheriff's Department and the Napa Police Department had no further involvement. Fox Supp. Decl. Ex. 2. Because the exhibits attached to Mr. Clark's declaration are largely irrelevant, unreliable and incomplete hearsay of a type not reasonably relied on by experts, and because Mr. Clark has not also considered police reports or other statements relating to the complaints in question to get a complete picture of what happened, his opinion on this point is unreliable. Plaintiff also appears to rely on the January incident involving her and Mr. Green where Officer Fullmore came to her house and drove Mr. Green and his son to a hotel. However, Plaintiff admittedly did not want the police to take action against Mr. Green at that time, no adverse action was taken against her, and she did not file any complaint, so this incident does not support her theory. Further, even if the Court were to consider all of the underlying evidence, two unrelated, isolated citizen's complaints relating to off-duty

**United States District Court**
For the Northern District of California

1   officers (both factually very dissimilar from the circumstances in this case) are insufficient to

2   establish the existence of a municipal policy or custom that led to Plaintiff's arrest.

3         Mr. Clark's other statements relating to <u>Monell</u> liability, also based on the same unreliable

4   exhibits, are stated as mere possibilities (i.e., "officers *may* believe they will not be held

5   accountable," "Department *may* have had notice," "City of Napa *may* have a policy of not

6   investigating lawsuits," failure to conduct investigation "*may* constitute deliberate indifference,"

7   "acts, omissions, and acquiesces *may* have created an environment . . . which *may* have caused her

8   arrest"). <u>See</u> Clark Decl. ¶¶ 113-18 (emphasis added). This speculative testimony is similarly

9   unhelpful to Plaintiff to defeat summary judgment of her <u>Monell</u> claim. <u>See Clouthier v. County of</u>

10  <u>Contra Costa</u>, 591 F.3d 1232, 1252 (9th Cir., 2010) (in § 1983 action, finding no material evidence

11  on issue of County's knowledge or the obviousness of the problem despite expert declaration on

12  issue because his opinions were conclusory); <u>see also Soremekun v. Thrifty Payless, Inc</u>., 509 F.3d

13  978, 984 (9th Cir.2007) ("Conclusory, speculative testimony in affidavits and moving papers is

14  insufficient to raise genuine issues of fact and defeat summary judgment.").

15        Instead of relying on her expert, Plaintiff argues that evidence of a municipality's

16  indifference to complaints can form the basis for <u>Monell</u> liability, and puts forward what she claims

17  is evidence that the City of Napa "has been placed on notice of claims against public entities and

18  complaints against police officers that are not investigated" and the claims are "deliberately

19  ignore[d]". Hearing Transcript at 40, 50. The only case Plaintiff cites for this position in her

20  opposition, <u>Vineyard v. County of Murray, Georgia</u>, 990 F.2d 1207, 1212 (11th Cir. 1993), from

21  another circuit, addressed inadequate supervision, training and discipline in an excessive force case

22  where the municipality had *no* procedures for following up on citizen complaints, unlike here.

23  Further, Plaintiff's claims are not based on any failure to investigate following the incident and her

24  subsequent complaint, but based on her allegedly false arrest. Therefore, whether the Napa Police

25  Department was on notice of a pattern of failure to investigate citizen's complaints after arrests does

26  not bear on the violation of her constitutional rights at issue, i.e., false arrest.

27        In any event, there is insufficient evidence of any such "failure to investigate" citizen's

28  complaints of false arrests. In her opposition and during oral argument, Plaintiff specifically relied

United States District Court
For the Northern District of California

on five incidents.  First, Plaintiff pointed to the January 2009 incident where she called a non-emergency police number and Officer Fullmore came to her house and drove Mr. Green and his son to a hotel.  However, she was not arrested and there is no evidence that she filed a citizens complaint with the Napa Police Department that was not investigated that might have put the Sheriff or anyone else on notice of any pattern of practice of violations of citizen's rights.

Second, she relied on the April 2009 incident at issue in this case and its aftermath.  Plaintiff relied on her visit to the Napa police station on April 8 during which she claims that she was not given a form about filing a complaint.  Regardless of whether she was given a complaint form, however, she did complain about her treatment, eventually filing the federal complaint which brought about this litigation, and there is no evidence that her complaint was not investigated.

Third, she pointed to the incident involving Ms. Gomes who was allegedly pushed and called Aunt Jemina by an off-duty Alameda County Deputy Sheriff who flashed a badge at her in the city of Napa, after which she reported the incident to a Napa police officer.  See Clark Decl. ¶ 117.  There is no evidence that Ms. Gomes was arrested, and instead she was referred to the Napa County Sheriff's Department where she filed a complaint (see Fox Supp. Decl. Ex. 2) so is irrelevant for this purpose.  There is also no evidence of how this complaint was investigated.

Fourth, she relied on a 2003 incident where a citizen filed a complaint after she was arrested by the Napa County Sheriff's Department at a Los Lobos concert after trying to defend her mother during a confrontation with an off-duty Napa police officer after her mother exited a van as the officer was approaching the van.  However, the complainants later admitted that they started the fight and there is no evidence regarding any post-incident investigation.  See Clark Decl. ¶ 108(a).

Fifth, she relied on an unsupported contention that claims and lawsuits for false arrest are generally not investigated by the Napa Police Department but handled by an insurance carrier.  See Clark Decl. ¶ 110 (unsupported hearsay statement).  However, there is no evidence to support this allegation, and even if true there is no evidence of any complaints about this procedure that would have put the City on notice of a failure to investigate complaints.  Thus, *none* of Plaintiff's evidence indicates a pattern or practice of failing to investigate citizen's complaints or that the City of Napa was on notice of any such pattern or practice.

**United States District Court**
For the Northern District of California

1    Plaintiff also appears to rely on a "failure to discipline" theory.  In <u>Kanae v. Hodson</u>, 294

2    F.Supp.2d 1179, 1189-1190 (D.Hawai'I, 2003), the court discussed the Ninth Circuit caselaw on

3    inferring a policy from a failure to discipline.  The court concluded that, while municipal liability

4    under § 1983 may arise from a city's failure to reprimand an employee, "something more than the

5    failure to reprimand is needed to survive a motion for summary judgment."  <u>Id</u>.  Plaintiff has not

6    pointed to "something more" than a failure to reprimand Officer Bender for her arrest to support an

7    inference of an unconstitutional policy.

8    Accordingly, the Court GRANTS summary adjudication of Plaintiff's <u>Monell</u> claim against

9    the City and Chief Melton.

10    **3.    State Law False Arrest Claim**

11    California Penal Code § 847(b) provides:

12    There shall be no civil liability on the part of, and no cause of action shall arise
      against, any peace officer or federal criminal investigator or law enforcement
13    officer . . . acting within the scope of his or her authority, for false arrest or false
      imprisonment arising out of any arrest under any of the following circumstances:
14    (1) The arrest was lawful, or the peace officer, at the time of the arrest, had
      reasonable cause to believe the arrest was lawful.

15

16    Because there is a triable issue of fact as to probable cause for Plaintiff's arrest, summary

17    adjudication of this claim is DENIED.

18    **4.    Intentional Infliction of Emotional Distress**

19    To prevail on a claim for intentional infliction of emotional distress, Plaintiff must prove:

20    "(1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless

21    disregard of the probability of causing emotional distress; (3) the plaintiff's suffering  severe or

22    extreme emotional distress; and (4) actual and proximate  causation of the emotional distress by the

23    defendant's outrageous conduct."  <u>Trerice v. Blue Cross of Cal.</u>, 209 Cal.App.3d 878, 883 (1989).

24    Outrageous conduct must "be so extreme as to exceed all bounds of that usually tolerated in a

25    civilized society."  <u>Id.</u>

26    The City Defendants argue that there is no evidence of such outrageous conduct, or that

27    Officer Bender intended to cause Plaintiff emotional distress or recklessly disregarded the

28    probability that such distress would result from his actions.  Plaintiff counters that Officer Bender's

35

1    actions in conspiring to falsely arresting her resulted in severe emotional distress and damage to her.

2    Hernandez Depo. at 47-49.   Because there is a triable issue as to false arrest and conspiracy to

3    falsely arrest her in favor of Mr. Green, there is a triable issue as to this claim as well.   Summary

4    adjudication is DENIED.

5        **5.    Negligence**

6        The City Defendants move for summary adjudication of Plaintiff's negligence claim against

7    Officer Bender on grounds that he had no duty to divine information that Plaintiff refused to reveal,

8    investigate the matter differently, or refrain from arresting her after finding probable cause.   An

9    action in negligence requires a showing that the defendant owed the plaintiff a legal duty, that the

10   defendant breached the duty, and that the breach was a proximate or legal cause of injuries suffered

11   by the plaintiff.   See Ann M. v. Pacific Plaza Shopping Center, 6 Cal.4th 666, 673 (1993); see also

12   Zelig v. County of Los Angeles, 27 Cal.4th  1112, 1128 (2002) ("law enforcement officers, like

13   other members of the public, generally do not have a legal duty to come to the aid of [another]

14   person . . . .").

15       Plaintiff argues that a "special relationship" arose between her and Officer Bender when he

16   responded to her 911 call, as it does "when the conduct of a police officer, in a situation of

17   dependency, results in detrimental reliance on him for protection."   See Williams v. State of

18   California, 34 Cal. 3d 18, 25 (1983).   In Williams, the Court held that highway officer's stop to a

19   assist motorist did not by itself create a duty to investigate, noting that, "[r]ecovery has been denied .

20   . . for injuries caused by the failure of police personnel to respond to requests for assistance, the

21   failure to investigate properly, or the failure to investigate at all, where the police had not induced

22   reliance on a promise, express or implied, that they would provide protection." Id.  However,

23   Williams also stated that "[l]iability may be imposed if an officer voluntarily assumes a duty to

24   provide a particular level of protection, and then fails to do so [citations omitted], or if an officer

25   undertakes affirmative acts that increase the risk of harm to the plaintiff."  If Plaintiff is successful in

26   establishing a conspiracy between the officers and Mr. Green to arrest her in favor of Mr. Green, this

27   could be an affirmative act that increased the risk of harm to Plaintiff and a breach of their duty to

28   her.  Further, pursuant to state law and Napa police policy, Officer Bender had a duty to consider

1   trespass and self-defense in assessing the domestic violence incident and determining who was the

2   dominant aggressor and he admittedly breached this duty.

3          Officer Bender also argues that he is immune from liability for negligence under California

4   Government Code § 802.2, which provides that : "Except as otherwise provided by statute, a public

5   employee is not liable for any injury resulting from his act or omission where the act or omission

6   was the result of the exercise of the discretion vested in him, whether or not such discretion be

7   abused."   However, the mere existence of discretionary choice in  the act to be performed does not

8   bring the act within the reach of section 802.2, as virtually all acts that a governmental employee is

9   called upon to perform involve some degree of  choice.  Johnson v. State of California, 69 Cal.2d

10  782, 788- 90 (1968).   Rather, immunity should attach only to those decisions which involve "basic

11  policy" choices which constitute an exercise of discretion.  Id. at 793 (a "workable definition" of

12  immune discretionary acts draws the line between "planning" and "operational" functions of

13  government.  Immunity is  reserved for those "basic policy decisions [which have] . . . been

14  [expressly] committed to coordinate branches of government," and as to which judicial interference

15  would thus be "unseemly.").  There is no basis for immunizing "ministerial" decisions that merely

16  implement a basic policy already formulated.  See Johnson, 69 Cal.2d at 795-96 (immunity applies

17  only to deliberate and considered policy decisions, in which a "[conscious] balancing [of] risks and

18  advantages . . . took place.  The fact that an employee normally engages in 'discretionary activity' is

19  irrelevant if, in a given case, the employee did not render a considered decision. [Citations]."); see

20  also Scott v. County of Los Angeles, 27 Cal.App.4th 125, 142 (1994).

21         Here, Officer Bender's arrest of Plaintiff does not rise to the level of a deliberate and

22  considered policy decision entitled to immunity under this section because he claims that he acted

23  operationally pursuant to policies made by others.  See Gillan v. City of San Marino, 147

24  Cal.App.4th 1033, 1051 (2007) (section 820.2 immunity inapplicable where the decision to arrest

25  was not a basic policy decision, but only an operational decision by the police purporting to apply

26  the law).

27         For the reasons discussed above, summary adjudication of the negligence claim is DENIED.

28         **6.      Respondeat Superior Liability of City and Chief Melton**

1    "The doctrine of respondeat superior imposes vicarious liability on an employer for the torts

2    of an employee acting within the scope of his or her employment, whether or not the employer is

3    negligent or has control over the employee." Jeewarat v. Warner Bros. Entertainment Co., 177 Cal.

4    App.4th 427, 434 (2009) (quoting Baptist v. Robinson, 143 Cal.App.4th 151, 160 (2006)); see also

5    Cal. Govt. Code § 815.2 (("a) A public entity is liable for injury proximately caused by an act or

6    omission of an employee of the public entity within the scope of his employment if the act or

7    omission would, apart from this section, have given rise to a cause of action against that employee or

8    his personal representative. (b) Except as otherwise provided by statute, a public entity is not liable

9    for an injury resulting from an act or omission of an employee of the public entity where the

10   employee is immune from liability.").

11   Plaintiff alleges that the Defendant Officers committed the acts described in the complaint

12   during the course and scope of their employment and that therefore, the City and Chief Melton are

13   liable for Plaintiff's injuries pursuant to respondeat superior.  FAC ¶¶ 42-44.  The City Defendants

14   do not contest that the acts were within the scope of Officer Bender's employment, but simply

15   argues that this claim is dependent on the other claims against Officer Bender and fails for the same

16   reasons.  As discussed above, the Court disagrees and summary adjudication of this claim is

17   DENIED.

18   **V.      Deputy Hallman's Joinder In Motion**

19   Deputy Hallman has filed a joinder in the motion for summary judgment and further moves

20   for an order granting summary judgment of the sole remaining claim against him, the conspiracy

21   claim, on the basis that: (1) it is undisputed that Hallman had no involvement in Plaintiff's arrest; (2)

22   Plaintiff's allegations and discovery responses are conclusory; (3) the claim is precluded because

23   Officer Bender had probable cause to arrest her so there was no constitutional violation; and (4) he is

24   immunized from the claim by qualified immunity.

25   In denying summary judgment of the conspiracy claim against Deputy Hallman previously,

26   the Court held:

27   At oral argument, Deputy Hallman also argued that Plaintiff's conspiracy claim
     fails as a matter of law because there is no triable issue of fact as to the

28   underlying civil rights violations and there was probable cause to arrest Plaintiff

as the "dominant aggressor."  However, the arresting officers have not yet moved for summary judgment and, as discussed above, the Court need not and does not reach the issue of whether there was probable cause to arrest Plaintiff at this point in the litigation. However, the City of Napa defendants have informed the Court that they intend to move for summary judgment at a later date.  If, at that time, the Court grants summary judgment in their favor on the issue of whether there was an underlying constitutional violation, then Deputy Hallman's argument with respect to the conspiracy claim may have merit.  The Court therefore DENIES summary adjudication of Plaintiff's conspiracy claim without prejudice to Deputy Hallman's ability to request that the Court reconsider this very limited issue following a ruling on the City of Napa Defendants' summary judgment motion.

Deputy Hallman's first point is unavailing since he did not have to be the one who arrested to her to be part of a conspiracy to do so.  He presents no evidence or argument in favor of his second point, other than general reference to all pleading previously filed.  Further, he was not given permission to move for summary judgment again on these issues.  With respect to his third and fourth points, as discussed above the Court finds that there is a triable issue of fact as to whether there was probable cause to arrest Plaintiff as well as whether there was a conspiracy, so the claim against Deputy Hallman does not fail as a matter of law for lack of an underlying constitutional violation.  Deputy Hallman's motion is therefore DENIED.

At the hearing on February 15, 2011, the Court vacated the pretrial and trial dates and indicated that it would set a further case management conference should any claims remain in the case following the Court's decision on summary judgment.  A further case management conference shall be held on April 5, 2011 at 10:00 a.m. during which pre-trial dates and a trial date shall be set. No later than March 29, the parties shall submit an updated case management conference statement indicating their preferred dates for trial of this matter, and whether the Court should refer this case to another Magistrate Judge for a settlement conference.

**IT IS SO ORDERED.**

Dated: March 21, 2011

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge

39